SQUARE BUTTE ELECTRIC COOPERA-
TIVE, Plaintiff and Appellant,

v.

E. Gene HILKEN, Defendant and Appel-
lee, and eight companion cases.*

Civ. No. 9194.

Supreme Court of North Dakota.

June 23, 1976.

Rehearing Denied July 21, 1976.

* Square Butte Electric Cooperative, Plaintiff and Appellant v. the following Defendants and Appellees: Donald T. Bender, et al.; Robert J. Dohn, et al.; Clarence W. Small, et al.; Edmund Spitzer, et al.; Lawrence Sorch, et al.; John Sorch; Ernest Lang; Douglas A. Miller, et al.

Vogel, Vogel, Brantner & Kelly, Fargo, and Johnson, Johnson & Devine, Lakota, for plaintiff and appellant; argued by John D. Kelly, Fargo.

Christensen & Baer, Bismarck, and Jos. A. Vogel, Jr., Mandan, for E. Gene Hilken, Donald T. Bender and Judy A. Bender, Robert J. Dohn and Mary Dohn, Clarence W. Small and Ellen C. Small, Edmund Spitzer and Margaret Spitzer, defendants and appellees; and Jos. A. Vogel, Jr., Mandan, for Ernest Lang, defendant and appellee; appearances by Carma A. Christensen, Bismarck and Jos. A. Vogel, Jr., Mandan; argued by Jos. A. Vogel, Jr., Mandan.

Alfred C. Schultz, Bismarck, for Lawrence Sorch and Gail Sorch, and John Sorch, defendants and appellees.

Dr. and Mrs. Douglas A. Miller, pro se.

Mr. and Mrs. Frank Murray, not represented by counsel.

ERICKSTAD, Chief Justice.

This is an appeal from a judgment entered in Burleigh County District Court on September 18, 1975, which denied to Square Butte Electric Cooperative the power of eminent domain for failure to establish a public use.

In *Square Butte Electric Cooperative v. Dohn,* 219 N.W.2d 877 (N.D.1974), we held that Square Butte was required in its application for a permit to enter upon private property for the purpose of making a survey relating to a possible taking, only to show that it was in the category of persons entitled to seek eminent domain. We also held that whether the specific land sought to be surveyed was "compatible with the greatest public benefit and the least private injury," Section 32–15–06, N.D.C.C., was an issue that would not ripen prior to the commencement of an eminent domain action.

In its findings of fact in this action, the trial court determined that "the selection of the route is compatible with the greatest public benefit and the least private injury." That finding is not challenged here.

After briefly reviewing some cases cited by the parties in *Dohn* relating to public use, we deferred ruling on the public use issue:

"Because we believe that a determination of this issue is premature at this time, a condemnation action having not

been commenced, and that it is better to delay a determination of what constitutes a public use until that issue has been more extensively briefed and considered by the trial court in conjunction with the condemnation action itself, we shall not attempt to determine this issue at this time." *Id.*, at 882.

The matter before us relates specifically to public use. The trial court's conclusions of law read as follows:

"1. That the plaintiff, Square Butte, has wholly failed to sustain its burden of proving public use and the Complaint of the plaintiff is hereby dismissed in all things, with prejudice, and with costs to the defendants.

"2. That any association of Square Butte with power pools and energy back-ups is not direct enough to support requirement of public use;

"3. That Square Butte will not supply electrical power to the citizens of North Dakota;

"4. That the plaintiff has established the necessity for the taking of the easements as to the route selected and would be entitled to the right of eminent domain on this question if public use has been established."

In order to clarify our discussion of the findings of fact and the judgment, let us review the background and the parties to this action.

Square Butte was incorporated in North Dakota on May 24, 1972, to generate and transmit electric power to rural electric cooperatives. It was capitalized at $1,000 through issuance of 100 shares at $10 per share. Square Butte employs only one person, its general manager Lyle Lund, who has been employed by Minnkota Power Cooperative for nearly 25 years.

Minnkota is a wholesale distributor of electricity organized in Minnesota with its principal place of business being Grand Forks, North Dakota. There are 12 Class A members of Minnkota who own and govern the distributor. Those 12 include four rural electric cooperatives in eastern North Dakota and eight rural electric cooperatives in northwestern Minnesota. Each of the 12 rural electric cooperatives has one representative on Minnkota's board of directors and a designated number of delegates to attend Minnkota's annual meeting.

There are 58,000 billed customers on Minnkota's lines with the number evenly divided between North Dakota and Minnesota. In addition to the Class A members of Minnkota, there are a number of investor-owned utilities and other generation and transmission cooperatives which purchase surplus power from Minnkota on a short-term basis and which are designated as Class C members of Minnkota. Some of the Class C members supply electricity to North Dakota. Nonetheless, the corporate purpose is mainly to serve the 12 rural electric cooperatives who are Class A members.

In the early 1970's, according to witnesses called on behalf of Square Butte, the combination of increasing projected load growths on the Minnkota system and the curtailment of traditional Rural Electrification Administration loans led Minnkota to seek alternate sources of financing for new generating plants. An investor-owned utility serving part of northern Minnesota, including Duluth, was also looking for additional sources of power. Minnesota Power and Light, through negotiations with Minnkota, ultimately agreed to guarantee bonds and securities for construction of generation and transmission facilities in exchange for delivery of electrical power to its system. Because an after-acquired property clause in Minnkota's mortgage with REA would have rendered the project's financiers' interests junior to REA's interest in Minnkota property, the creditors required that a new entity—Square Butte—be formed to operate the Square Butte project facilities. Because of the amount of power to be sold to MP&L from the project, ownership of the project by Minnkota would also have resulted in loss of Minnkota's exempt status under 26 U.S.C. § 501 for certain internal revenue purposes.

For those reasons, Square Butte was incorporated with control resting in the 12

rural electric cooperatives who are Class A members of Minnkota. It subsequently entered into a power sales and interconnection agreement with MP&L.

The Square Butte project includes a 400 megawatt lignite fired generating plant (Center # 2) near Center, North Dakota, and a direct current (DC) transmission line from the plant to Duluth, Minnesota. Center # 2 will be adjacent to the Milton R. Young plant (Center # 1) and will require an additional 30 employees. The DC line will cross 225.8 miles of North Dakota, including 155.1 miles of nonirrigated cropland, 63.1 miles of pasture, 2.1 miles of woodland, and 5.5 miles of wetland. Square Butte is apparently seeking easements that are 120 feet wide.

Because the line is DC, Square Butte must install a converter at Center # 2 and MP&L must build another converter at Duluth. It is only before the power is converted from AC to DC at Center and after it is converted from DC to AC at Duluth that the power is usable by existing consumers. The system does not include any other converters and, because of the expense, none are presently planned.

Both Minnkota and MP&L are members of the Mid-Continent Area Power Pool (MAPP) which requires its members to maintain a 15% reserve capacity related to annual system demand. Square Butte is not a member of MAPP. The MAPP system is designed to maintain a degree of reliability such that in only one instance in 10 years will the pool not be able to serve all of the load requirements. Basically, it provides a system capacity to cover generation plant outages, whether scheduled or not.

The defendants herein are landowners in Burleigh County, across whose property Square Butte seeks easements for its DC power line and structures.

Given this factual background and the district court's ruling, we must discuss three matters: (1) whether the public use issue is proper for judicial determination; (2) what the requisites of public use are;

and (3) how application of those requisites affects disposition of this case.

## I.

▮ The power of eminent domain inheres in the sovereignty of the state and is not dependent on any specific grant. *Georgia v. City of Chattanooga,* 264 U.S. 472, 480, 44 S.Ct. 369, 370, 68 L.Ed. 796 (1924); *Albert Hanson Lumber Co. v. United States,* 261 U.S. 581, 587, 43 S.Ct. 442, 444, 67 L.Ed. 809 (1923); 1 Nichols, Eminent Domain § 1.3 (3d ed. 1975). It is not, however, an unfettered power. Section 14 of the North Dakota Constitution provides in pertinent part that "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner. * * *" *See* 1 Nichols, Eminent Domain § 1.4 (3d ed. 1975).

It is also circumscribed by statute:

"*32–15–01. 'Eminent domain' defined —How exercised.*—Eminent domain is the right to take private property for public use. Private property shall not be taken or damaged for public use without just compensation first having been made to or paid into court for the owner. * * * The right of eminent domain may be exercised in the manner provided in this chapter." N.D.C.C.

By Section 32–15–02, N.D.C.C., and subject to the provisions of the chapter,
" * * * the right of eminent domain may be exercised in behalf of the following public uses:
" * * *

"10. Oil, gas, and coal pipelines and works and plants for supplying or conducting gas, oil, coal, heat, refrigeration, or power for the use of any county, city, or village, or the inhabitants thereof, together with lands, buildings, and all other improvements in or upon which to erect, install, place, maintain, use, or operate pumps, stations, tanks, and other machinery or apparatus, and buildings, works, and plants for the purpose of generating, refining, regulating, compressing, transmitting, or

distributing the same, or necessary for the proper development and control of such gas, oil, coal, heat, refrigeration, or power, either at the time of the taking of said property or for the future proper development and control thereof; and

" * * * ."

In *Dohn* we intimated by delaying determination of the public use issue until it had been more extensively briefed and considered by the trial court that merely falling within the purposes of Section 32–15–02, N.D.C.C., is insufficient to satisfy the requirement of Section 14, N.D.Const., that a use must be public before private property can be taken by eminent domain. Where the existence or non-existence of public use is placed in issue, the determination, dependent as it is upon the facts and circumstances of the matter, is properly a judicial one.

While this conclusion is implicit in many cases that concern the public use issue, it has been squarely met in at least two cases from other jurisdictions. In *Clark v. Gulf Power Company,* 198 So.2d 368 (Fla.App. 1967), the court declared, "The constitutional guarantee of due process and prohibition of the taking of private property without full compensation decree that the use for which the property is taken must be a public use * * * ." *Id.,* at 371. Where a city sought to condemn land for off-street parking plazas, a purpose listed in California statutes as one for which eminent domain may be exercised, the court in *City of Menlo Park v. Artino,* 151 Cal.App.2d 261, 311 P.2d 135 (1957), indicated its agreement "with appellants' contention that neither the legislature's designation nor the city's resolution that the parking plazas are a public use can make that which is in fact a private use become a public use." 311 P.2d at 140.

In North Dakota, an 1896 decision includes the statement, "True it is that the courts can always inquire into the nature of the use for which the property is to be condemned for the purpose of determining whether such is, in fact, a public use." *Bigelow v. Draper,* 6 N.D. 152, 165, 69 N.W. 570, 574 (1896).

## II.

As to the requisites of a public use, we find a decision of the Montana Supreme Court generally descriptive:

"At the outset, we recognize that there are two conflicting lines of authority in other jurisdictions concerning the requisites of a 'public use' within the meaning of eminent domain proceedings. One view, the limited or narrow view, requires in general the actual use or right to use the proposed system by the public as a whole. The other view, called the broad view, essentially requires only a use conferring a 'public advantage' or a 'public benefit'. Montana, as with many western states, has adhered to the broad view since 1895, presumably to promote general economic development. [Citations omitted.]

"Thus, in Montana a public use is one which confers some benefit or advantage to the public. Such public use is not confined to actual use by the public, but is measured in terms of the right of the public to use the proposed facilities for which condemnation is sought. As long as the public has the right of use, whether exercised by one or many members of the public, a 'public advantage' or 'public benefit' accrues sufficient to constitute a public use. * * * " *Montana Power Company v. Bokma,* 153 Mont. 390, 457 P.2d 769, 772–773 (1969).

The court noted that Montana Power "is a public utility and as such has dedicated its property to the public use under regulations imposed by the Montana Public Service Commission." *Id.,* 457 P.2d at 773. It sustained use of the eminent domain power for an intrastate 115 KV line designed to furnish electricity to a crude oil pumping station, but the court noted that "service from that line is available to other customers should such service be required." *Id.,* at 771.

For a textual discussion of the narrow and broad views of public use referred to in

*Bokma,* and a comment on them, see 2A Nichols, Eminent Domain § 7.2 (3d ed. 1975).

While the project involved in *Bokma* was of an intrastate character, the reservoir with which the court was concerned in *Adams v. Greenwich Water Co.,* 138 Conn. 205, 83 A.2d 177 (1951), was of an interstate character. Responding to the contention that since the chartered defendant proposed to construct a reservoir greater in capacity than necessary to supply its Connecticut customers, then the reservoir was "for the exclusive benefit of nonresidents," the Connecticut Supreme Court conceded "that no state is permitted to exercise or authorize the exercise of the power of eminent domain except for a public use within its own borders. [Citations omitted.]" *Id.,* 83 A.2d at 182. But the court concluded, "If the taking is for a public use which will provide a substantial and direct benefit to the people of the state which authorizes it, it is a proper exercise of the power of eminent domain even though it also benefits the residents of another state." *Id.; accord, Grover Irr. & Land Co. v. Lovella Ditch, R. & Irr. Co.,* 21 Wyo. 204, 131 P. 43, 53 (1913); and Annot., 90 A.L.R. 1032 (1934).

In *Gralapp v. Mississippi Power Company,* 280 Ala. 368, 194 So.2d 527 (1967), the defendant was one of four companies affiliated with and controlled by the Southern Company, a public utility holding company. The Southern Company System had been unified from the perspective of generation and transmission and was

> "devised so that electrical power will flow from an area where there is an excess of generating ability at a particular time as compared with load or demand for electricity toward an area where there is (or there is a tendency to be) a deficiency of generating capacity as compared with the existing load in such deficiency area." *Id.,* 194 So.2d at 529.

The Alabama court declared that "it is a fundamental principle in the law of eminent domain that private property may not be condemned unless it is to be subjected to a recognized public use, affording benefits which are not vague, indefinite or restrictive. [Citations omitted.]" *Id.,* at 531. Responding to the argument that since Mississippi Power was not subject to the control of the Alabama Public Service Commission and since Alabama Power held only a contractual right to receive power transmitted over the proposed line, the public in Alabama had no legal right to benefits from the line, the Alabama court held that as the evidence in the case established that electricity would flow in both directions along the proposed line there was sufficient benefit to the public in Alabama.

The court in *Gralapp* by its discussion of the requirement that the public in Alabama benefit from the proposed line implied that the power of eminent domain must benefit the public within the territorial confines of the jurisdiction delegating the power of eminent domain. Two decisions have explicitly discussed the requirement.

The Wyoming Supreme Court in a case involving the diversion and appropriation of water in Wyoming for the irrigation of land in Colorado detected a principle "to be deduced from all the authorities, although distinctly stated in but few" that

> "in every case where the use as a justification for the proceeding has been questioned, the inquiry in that respect has been confined to the interest and welfare of the state or sovereignty within whose limits or jurisdiction the land sought to be condemned is located." *Grover Irrigation, supra,* 131 P. at 55.

The court also declared that the benefit must "arise directly" from the proposed use and that "the interest or welfare dependent upon or affected by development and growth in another state" is insufficient to uphold the exercise of eminent domain. *Id.*

In *Clark* the Florida court determined that the pleadings were insufficient to allege a public use and declared:

> " * * * the sovereign's power of eminent domain, whether exercised by it or delegated to another, is limited to the sphere of its control and within the jurisdiction of the sovereign. A state's power exists only within its territorial limits for

the use and benefit of the people within the state. Thus, property within one state cannot be condemned for the sole purpose of serving a public use in another state. Conjecture might be made that electrical current generated in Georgia will flow into Florida for the benefit of Florida citizens and vice versa; however, the pleading before us indicates that a one way transmission line is contemplated from which the citizens of Florida will not derive one iota of benefit." *Clark v. Gulf Power Company, supra,* 198 So.2d at 371.

As a result of the insufficient pleadings, the order of taking was reversed and the cause remanded. *Id.,* at 372.

■ From these cases, it appears that the following elements must be present for a public use to exist in the state where the property sought to be condemned lies. First, the public must have either a right to benefit guaranteed by regulatory control through a public service commission [*Bokma*] or an actual benefit [*Gralapp*]. Second, although other states may also be benefited, the public in the state which authorizes the taking must derive a substantial and direct benefit [*Greenwich Water*], something greater than an indirect advantage [*Grover Irrigation*]. Third, the public benefit, while not confined exclusively to the state authorizing the use of the power [*Greenwich Water*], is nonetheless inextricably attached to the territorial limits of the state because the state's sovereignty is also so constrained [*Clark* and *Grover Irrigation*].

To dispose of this case, we must determine whether the benefits alleged by Square Butte provide, either singly or in unison, a substantial and direct benefit to North Dakota.

### III.

*Reserve and Emergency Power Supplies*

Square Butte alleges first that its project will increase reserve and emergency power supplies available within North Dakota. The Mid-Continent Area Power Pool re-quires each of its participants to hold fifteen percent of its total generating capacity in reserve to meet emergency and short-term requirements. Since MP&L and Minnkota are both members of MAPP, the project will increase the reserve supply available to MAPP participants.

The trial court found "[t]hat any association of Square Butte with power pools and energy backups is not direct enough to support requirement of public use." Reserve supplies of electricity through power pooling are designed to increase the reliability of power systems and to decrease capital expenditures since each company need not install a reserve capacity equal to the size of its largest generating unit.

The Square Butte project adds 60 megawatts of reserve and emergency power supply to what would otherwise be available to the North Dakota members of MAPP. This is a significant factor relating to the adequacy and reliability of the power pool reserve. There may be, additionally, certain economic benefits to North Dakotans from Center # 2 as a backup source of power. We discuss that later in this opinion.

### Stabilizing Effect of DC Line on Supply System

Square Butte does contend that the DC line will increase the reliability of the electrical supply system in North Dakota by reducing the frequency of phenomena known as "low frequency oscillations." Whether or not low frequency oscillation will occur depends on the combination of the amount of generation in the area, the amount of transmission and the strength of that transmission.

Professor Jack Krueger of the University of North Dakota further explained the phenomenon and its effect as follows:

"The oscillation process is a—an actual displacement between the generation and the utilization point on electric power. A good example, one that is used in our classwork at the University, is to have two electrical machines, one is a generator, one is a load connected by a transmission line.

"And as the load is brought up to a particular level, the mechanical displacement between the rotating element of the motor that comprises the load versus the position of the rotating element of the machine, that is the generator, has a certain angular displacement. As you increase the load this angular displacement will increase still further. And above a certain point the angular displacement becomes so bad that they fall out of synchronism. And the generator then speeds up, the motor slows down and eventually would come to a stop. At that point . . . the system has collapsed."

MP&L's manager of system planning testified that 68 low frequency undamped oscillations were recorded in North Dakota during 1972. He indicated that seven of those resulted in system collapses: "The transmission system in North Dakota breaking up, the units tripping off the line, circuit breakers opening, et cetera."

Since the power flow on a DC line is controllable by operator action, it can be modulated "in exactly the right phase relationship with those low frequency oscillations to damp them or get them to reduce in magnitude and disappear from the system." The modulation would apparently occur at Center as the current is changed into DC. The generation will bypass the AC transmission system and the flow of AC power will be introduced at "the eastern end of [the] system so that a return of energy to Square Butte will unload the existing facilities that are normally transferring power from west to east."

In effect, the disturbance will be moved from North Dakota to Minnesota where the distances between the generating systems and the effective load center of the system are different enough so that the oscillation will not hinder operations on the receiving end.

MP&L's employee was unable to specify the time or date of any system collapses in North Dakota, although he was aware that the Minnkota system had collapsed in 1972. He assumed that it took eight hours to get Minnkota's steam plant back on line, based on his experience with MP&L's plants of a similar size, but he did not know how long the outage lasted for the ultimate consumer. He testified that the length of such an outage "would depend upon the availability of energy in other systems; under certain circumstances we could put it back together in a few minutes, under others it may take hours."

Testimony at the trial included an averment that with the stabilizing effect of the DC line on the AC system the entire generating complex in the Bismarck area will be able to operate at a higher output level than currently exists. During his deposition, Professor Krueger indicated additional generation on the AC system "with a stabilizing DC line . . . would not contribute to instability of the system, but without the line it would."

MP&L chose the DC line after its studies indicated that various 345 KV AC transmission schemes totaling more than 950 miles of line would not be "adequate to support the [generating] unit in North Dakota and deliver its output to the MP&L service area for the initial seven-year period."

MP&L's manager of system planning concluded that the DC line "will make the AC systems more reliable and increase the capability of loading those transmission lines that leave the generating complex in the Bismarck area."

None of the trial court's findings of fact concern the effect of the DC line on low frequency oscillations. In his memorandum opinion, the trial judge observed, "There has been testimony regarding the stabilization of the AC lines within the State of North Dakota which this Court finds is not persuasive enough to supply public use for condemnation purposes."

■ By Rule 52(a), N.D.R.Civ.P., we may not set aside findings of fact in civil actions unless such findings are clearly erroneous. We explained that standard in *In re Estate of Elmer,* 210 N.W.2d 815 (N.D.1973):

"A finding is 'clearly erroneous' only when, although there is some evidence to

support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. [Citation omitted.] The mere fact that the appellate court might have viewed the facts differently, if we had been the initial trier of the case, does not entitle us to reverse the lower court. [Citations omitted.]" *Id.* at 820; *accord, Schumacher v. Schumacher,* 242 N.W.2d 136 (N.D.1976); *In re Estate of Blank,* 219 N.W.2d 815 (N.D.1974)

In light of the fact that the testimony asserting that the DC line will stabilize the existing AC generating and transmission systems in North Dakota was not disputed, it is possible that the trial court determined that the stabilizing effect is a benefit, but that such an influence is by itself insufficient to justify exercising the power of eminent domain. In any case we conclude that the trial court was clearly erroneous in not giving some effect to this influence. We think that the stabilizing influence is a factor that must be considered with other factors to determine whether there is a direct and substantial benefit to North Dakota.

### Electricity Available to North Dakota Consumers in Reasonable Future

The availability of electricity to Square Butte (and, hence, to Minnkota) is governed by a "Power Sales & Interconnection Agreement between Minnesota Power & Light Company and Square Butte Electric Cooperative" dated as of April 1, 1974. We quote from that contract:

"Section 3. *Availability of Power and Energy.* (a) Square Butte agrees to make available to MP&L at the Duluth, Minnesota, HVDC terminal all of the Net Capability, less line losses, to which MP&L is entitled under Section 3(b) below which can at any time be produced by Center # 2 either prior to or after the Completion Date without exceeding its reasonable and proper capability.

"(b) MP&L's entitlement to power shall be the entire Net Capability, reduced, at Square Butte's option, by amounts on a noncumulative basis as follows:

| | |
|---|---|
| beginning on the later of January 1, 1985 or the first day of the year following the year in which occurs the seventh anniversary of the Completion Date—October 31, 1987: | up to 126,000 kW, but not more than 30% of Net Capability |
| November 1, 1987—October 31, 1989: | up to 168,000 kW, but not more than 40% of Net Capability |
| November 1, 1989—October 31, 1994: | up to 210,000 kW, but not more than 50% of Net Capability |
| November 1, 1994 and thereafter: | not more than 51% of Net Capability. * * * |

"(c)  *   *   *
"(d)  *   *   * "

Square Butte must give MP&L five years' notice of its election to exercise any of its options and, once made, the elections are irrevocable. MP&L holds the right of first refusal on any surplus power inuring to Square Butte as a result of its option exercise, in which case the "price of such surplus energy shall be 75% of the overall average price paid by MP&L during the three immediately preceding calendar years for Economy Energy or its substitute . . . provided, however, that such overall average price shall not be less than 2.4 times the fuel cost of producing such energy at Center # 2."

If Square Butte purchases certain trust estates specified in the Bond Purchase and Participation Agreement and thereafter sells those assets to MP&L, or if the semiannual lease rentals exceed 5.25 percent of a specified sum, then Square Butte, on at least five years' notice to MP&L, may change MP&L's entitlement to power to the entire net capability reduced by 15,000 KW.

If Square Butte exercises any of its options, the obligation to retain the specified capacity continues for the remainder of the

30 year term of the agreement. That obligation can be altered by mutual agreement of the parties. In any event, Square Butte may reduce its options to the extent that MP&L restricts Square Butte's right to MP&L's transmission facilities.

Any power retained by Square Butte will be transferred by the DC line to Duluth and routed back to Square Butte by MP&L's transmission system. While the agreement contemplates that MP&L will have "substantial excess bulk transmission capacity" to facilitate the transfer and that MP&L will "endeavor to facilitate" such transfer, it is not intended that the agreement "shall obligate MP&L to finance new or additional transmission facilities." MP&L grants Square Butte a right to use such excess capacity as "shall be from time to time available thereon, which capacity is not needed to supply MP&L firm and wheeling loads, as determined by MP&L."

Subject to a grant of a 40,000 KW transmission capacity if Square Butte exercises any of its options, "MP&L will retain priority for use of its transmission system for service to its customers, and for carrying out the terms of existing agreements with other power suppliers."

Square Butte agrees not to engage in any business or activity other than Center #2 and its transmission facilities. Other sections of the agreement provide for consultation with and approval by MP&L relating to additional facilities and operating procedures at Center #2.

The jurisdiction of the North Dakota Public Service Commission is limited as to certain utilities by statute:

"49–02–01.1. *Jurisdiction of commission limited as to certain utilities.*—Nothing in this chapter shall authorize the commission to make any order affecting rates, contracts, services rendered, adequacy, or sufficiency of facilities, or the rules or regulations of any public utility owned and operated by the state or by any city, county, township, or other political subdivision of the state or any public utility that is not operated for profit, but all other provisions herein shall apply to such utilities. * * * " N.D.C.C.

Nor are such cooperatives subject to the requirement of obtaining a certificate of public convenience and necessity before beginning construction or operation of a plant or system or extension thereof. *See* Section 49–03–01.5, N.D.C.C. If sufficient regulatory powers were vested in the PSC, we would have precedent for holding the right to such power as a basis upon which to sustain the exercise of eminent domain. *See Montana Power Company v. Bokma, supra,* 457 P.2d at 772–773, and 2A Nichols, Eminent Domain § 7.221 (3d ed. 1975).

Square Butte asserts that REA has the authority to compel each of the 12 cooperatives "to exercise its option to assign all of its rights and obligations hereunder [to Minnkota] for the duration of this Agreement [the 'fifteen party' power sales agreement among Square Butte, Minnkota, the REA, and each of the twelve cooperatives] if the Administrator of REA shall so direct in writing at anytime." Considering that the purpose of the provision is merely to protect REA mortgage money and the admission that REA is "not likely to [force exercising the options] against the interests of the majority," we cannot hold that specific provision alone to be sufficient to sustain the power of eminent domain in North Dakota.

Given this absence of regulatory authority, we must determine from the record whether the trial court's conclusion that Square Butte will not supply electrical power to consumers in North Dakota is erroneous.

The trial court made the following findings of fact which bear upon the power sales and interconnection agreement:

"10. That agreements entered into, provided MP&L will receive all power from this line for 7 years, commencing when line becomes operational; such projected date to be 1985;

"11. That the afore agreement also allegedly provides Square Butte, the plaintiff herein, an option of taking up to

120 mega watts, but not more than 30% of the plant net capability;

"12. That the afore agreement also provides Square Butte, the plaintiff herein, an option of taking up to 51% of plant net capability some 17 years after line is in existence;

"13. That Board action would be necessary in order for an individual member of Minn-Kota and Square Butte to receive power;

"14. That the projection indicating a need for power by Minn-Kota and its members by 1977–78 assumes annual load growth based on average load growth only without other supporting authority;"

Defendants have made much of the fact that of Minnkota's directors the eight from Minnesota cooperatives can clearly control the four from North Dakota cooperatives. Since Square Butte can receive power only through exercising its options by its board of directors (the same board that directs Minnkota), the implication arises that Minnesotans on the board will prevent North Dakota from receiving any of the power produced at Center # 2. We suspect, however, that if the Minnkota system requires additional power at the times the options become available, and if it is economically advantageous to exercise those options, then those needs and advantages will not be overshadowed by a zealous state patriotism.

Whether the trial court's conclusion that Square Butte will not supply electrical power to citizens of North Dakota is correct depends on Finding of Fact # 14, not on # 13, and the power sales agreement.

Testimony at trial indicated that Minnkota had 366 megawatts of generating capacity and purchased power available to its consumers. Minnkota projected that during the winter of 1977–78 its system would have a 19 megawatt deficiency. With no additional power source the system is projected to have a 240 megawatt deficiency by 1982. By the mid-1980's, Minnkota's present power sources will supply approximately one-half of Minnkota's projected needs.

Since Minnkota will receive power from Center # 2 only during operational emergencies pursuant to the joint operating agreement or from the MAPP reserve system until January 1, 1985, or later, it proposes to make short-term purchases from the pool to use some type of short-operating peaking capacity, and to use interconnections with power sources in Manitoba. Cross-examination elicited an admission of the possibility that an additional generating unit could be constructed at Center during that period of time.

During the trial, which occurred in the autumn of 1975, MP&L projected its winter peak load at 762 megawatts. During 1980 MP&L's projected peak load will be 1505 megawatts. Its existing capacity was 855 megawatts. MP&L's manager of system planning testified that the taconite industry is the largest single user of electrical energy on MP&L's system, that its expansion is the major cause of increased power needs by the MP&L system, and that residential and commercial loads on the MP&L system were increasing at a relatively small rate.

MP&L anticipates that it will have a plant with a generating capacity of 500 megawatts on line by 1982, and it has asked the Minnesota Environmental Quality Council for a site capable of supporting between 1800 and 3400 megawatts of generation. It thus appears that if MP&L's projections are accurate, its system will be deficient in 1985 even with the power available from Center # 2 and from an additional 500 megawatt plant in Minnesota.

During direct examination Lyle Lund explained that Square Butte took an option rather than a firm commitment in case some "totally unheard of development . . . which could reduce the cost of power from some other source" is developed or in case a severe depression reduces demand for power in the Red River Valley. Asserting that he believed the power would be needed, he continued

"* * * If we did not have this Square Butte deal and we had no other way to go, we would probably build a plant and that would be a commitment.

We would have to use it. We would have to pay for it, whether we used it or not. This is a preferable arrangement from the standpoint of these rural electric consumers."

The trial court apparently concluded that Minnkota's projected needs are exaggerated since the projection "assumes annual load growth only without other supporting authority." While it is true that the trier of facts is not required to accept uncontradicted evidence of an interested party, *Waletzko v. Herdegen,* 226 N.W.2d 648 (N.D.1975), and *Bergley v. Mann's,* 99 N.W.2d 849 (N.D. 1959), as an appellate court we are left with the conviction that a mistake has been made in this instance.

The defendants did not challenge the projections during the trial nor did they seek to diminish the weight to be attached to the projections by inquiring into the statistical assumption used or the assumptions ignored by Minnkota. From our reading of the record, therefore, we cannot agree with the necessary implication arising from the trial court's findings and conclusions that Minnkota will not require additional electrical power when its options mature.

Given the lack of regulatory control over Square Butte by our PSC and the alterable nature of the power sales agreement, it is difficult to predict the extent of benefit which may be derived from the contract, but at the very least it must be considered a hedge against future increases in the cost of production and an insurance against shortage of power in 1985. Absent a showing that the contract is designed only to defraud North Dakota by allowing eminent domain without an attendant benefit to the State, the power sales agreement is a factor which should not be ignored. We conclude that the agreement evidences a reasonable probability that Minnkota's customers in North Dakota will receive power from the Square Butte project.

*Low Cost Power to the Consumer*

Square Butte asserts that operation of Center # 2 will reduce labor costs at Center # 1 and that when its options mature,

the associated cooperatives will be able to secure power based on present construction costs. Testimony at trial also indicated that with the stabilizing influence of the DC line, hydroelectric or low-cost steam generation can be increased, replacing higher cost oil or diesel-fired units on the extremities of the state, thereby lowering the cost to consumers in the entire state.

Additionally, Center # 2 will be available as a backup source of power if Center # 1 should suffer certain operational emergencies. Pursuant to the joint operating agreement between Square Butte and Minnkota, after the first two years of operation they will, during operational emergencies, share the net capability of the generating unit unaffected by the emergency condition within specified limits, including a maximum of 117 megawatts available to Center # 1 from Center # 2. The agreement allows sharing for an aggregate of 500 hours on the part of either party during any calendar year and for 168 hours during any single emergency.

Thus, it appears that, in addition to the reasonable probability that Minnkota customers in North Dakota will receive direct and substantial power after 1985, there are other incidental benefits in terms of power availability and cost savings to North Dakota.

Because of the cumulative effect of the increase in reserve and emergency supplies, of the stabilizing effect of the DC line on the existing AC system, of the existence of the options and the likelihood that Minnkota will exercise its options to receive power from Square Butte after 1985, of the lower cost of that power, and of certain incidental benefits, we disagree with the trial court's conclusion that Square Butte has failed to establish a public use. None of these features alone would suffice, but the sum of the benefits does meet the requirement that North Dakota receive a substantial benefit.

Therefore, we reverse the judgment of the district court that dismissed Square Butte's complaint, reinstate the cause of

action, and remand for assessment of damages.

PAULSON, J., concurs.

PEDERSON, Justice (concurring specially).

I concur in the results, and in the syllabus, but not in everything said in the opinion authored by the Chief Justice, and therefore deem it necessary to state my reasons. When this court states, in overruling a trial court, that on the entire evidence it is left with a definite and firm conviction that a mistake has been made, I have an uneasy feeling. In a vast majority of cases where Rule 52(a), N.D.R.Civ.P., is applicable, we have said, and the Rule states:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

In *Kleinjan v. Knutson,* 207 N.W.2d 247, 249 (N.D.1973), after referring to the above provision from Rule 52(a), we stated:

"It follows that if we are to apply this rule, we must apply as a corollary the rule that is applied in jury cases when the sufficiency of the evidence to support the verdict is questioned, and that is that in determining the sufficiency of the evidence to sustain the verdict (here, judge's findings) the evidence must be viewed in the light most favorable to the verdict. *Armstrong v. Miller,* 189 N.W.2d 688 at 691 (N.D.1971); *Gleson v. Thompson,* 154 N.W.2d 780 at 786 (N.D.1967); *Degenstein v. Ehrman,* 145 N.W.2d 493 at 503 (N.D.1966)."

See also, *Trinity Builders, Inc. v. Schaff,* 199 N.W.2d 914, 917 (N.D.1972), and, for the application of the same principle even before Rule 52(a) existed, *James River Nat. Bank v. Weber,* 19 N.D. 702, 124 N.W. 952 (1910), at syllabus 1.

In the instant case, when I read the trial court's findings of fact and review the evidence only to determine whether there is substantial evidence to support each of such findings, I am not left with the definite and firm conviction that a mistake has been

made in any of the findings. In addition, the appellant failed to directly attack any specific finding of fact and we are, therefore, only justified in reviewing them generally. See syllabus 1 of *Sorenson v. Olson,* 235 N.W.2d 892 (N.D.1975). Only when I examine the trial court's conclusions of law do I find that a mistake has been made. The trial court made the following conclusions of law:

"1. That the plaintiff, Square Butte, has wholly failed to sustain its burden proving public use and the Complaint of the plaintiff is hereby dismissed in all things, with prejudice, and with costs to the defendants;

"2. That any association of Square Butte with power pools and energy backups is not direct enough to support requirement of public use;

"3. That Square Butte will not supply electrical power to the citizens of North Dakota;

"4. That the plaintiff has established the necessity for the taking of the easements as to the route selected and would be entitled to the right of eminent domain on this question if public use had been established;"

In its memorandum opinion the trial court shows that it relied primarily upon the early Wyoming case of *Grover Irrigation and Line Company v. Lovella Ditch, Reservoir and Irrigation Company,* 21 Wyo. 204, 131 P. 43 (1913), and the following statement from Nichols, Eminent Domain, 3d ed., Vol. 1, Section 2.111:

"The power of eminent domain in any sovereignty exists only for its own purposes. The fundamental principle which forms the base upon which the power rests does not permit the exercise of the power for purposes other than to enable the state to effect its own proper ends and the policy of its laws."

Neither the Wyoming decision nor the Nichols statement are inconsistent with a reversal of the judgment entered in this case. The concept of public use is, first of all, a matter to be determined by legislation

and, where the Legislature has declared a particular use to be a public use, the presumption is in favor of that declaration and the courts will not interfere unless the use is clearly and manifestly not a public use. Some courts have held that they can interfere only if the legislative determination of public use is arbitrary or unreasonable, or if it was induced by fraud, collusion, or bad faith, or if it is a perversion of the power of eminent domain. "The role of the judiciary in determining whether the power of eminent domain is being exercised for a public purpose has been said to be an exceedingly narrow one." 29A C.J.S. Eminent Domain, § 30, at 258. See generally, 29A C.J.S. Eminent Domain, § 29, "Necessity That Use Be Public," § 30, "Determination of Character of Use," and § 31, "What is a Public Use." Also, Annotation in 90 A.L.R. 1032.

North Dakota has not, in its Constitution, by statute, or judicial precedent, defined in any limited manner the nature, quantity, or quality of the benefit which must be shown to result to North Dakotans before the right of eminent domain may be exercised. The Legislature has defined eminent domain as *the right to take private property for public use* (§ 32–15–01, NDCC). The *public uses* for which eminent domain may be exercised are itemized in § 32–15–02, NDCC, and specifically include " *  *  * power transmission lines  *  *  *."

I would agree with the trial court where, in its memorandum opinion, it said: "It is the belief of this Court that the legislature should re-examine the powers of eminent domain which it has granted to a number of private enterprises, thereby subordinating the right of its citizens." I do not understand why, after making that statement, the court proceeded to diminish the power itself rather than wait for the Legislature to do so.

At the time our eminent domain rules were being written, our greatest concern related to the bolstering of the State's economy. The public welfare would have been assumed to be benefited by anything which would enhance the opportunity to market our natural resources and excess energy.

Now we realize that economic welfare must be balanced against conservation of natural resources and the protection of the environment. Realizing that the energy situation could well be of crisis proportions in the future, and realizing further that it is of national concern and not controllable within the borders of any one State, future legislation should consider the impact on interstate commerce and the likelihood of Federal takeover if the States adopt too provincial an attitude. Even in the matter of costs recoverable against the condemnor, our interests are better served by allowing State courts to retain jurisdiction rather than abdicating and allowing Federal takeover.

It is pertinent to examine a few of the cases which have revolved around the definition of "public use." The Wyoming *Grover Irrigation* case, *supra,* was decided in 1913 and involved the exportation of water from the State of Wyoming. From a philosophical point of view, would anyone have expected semi-arid Wyoming (like semi-arid North Dakota) to reach any other result? It will be interesting to see whether Wyoming, or any other semi-arid State, strictly adheres to that ruling should the question arise as to the exercise of the right of eminent domain to provide for the exportation of coal by slurry pipeline. There is a greater benefit to Wyoming (and to North Dakota) to retain State water than to export it. It is perhaps a greater benefit to Wyoming to export its coal than to process it into gas or electrical energy, polluting its air in the process, and then export clean energy.

The Territory of Alaska decided an interesting case in 1926—*Alaska Gold Recov. Co. v. Northern M. & T. Co.,* 7 Alaska Reports 386. After a thorough examination of the holdings, both in the Federal and State courts, the Territorial Court concluded that the term "public use" had received enlarged scope and meaning; that the test was no longer confined to use by the public, but use for the public welfare. The opinion decided that economic and other benefits to the inhabitants justified the use of the right of

eminent domain to facilitate the mining of gold in Alaska.

Two additional cases require comment to illustrate the complexity of the term "public use." The United States Supreme Court in *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), discussed the question of whether the acquisition of private property in a Washington, D.C. substandard housing and blighted area, for redevelopment and resale, constituted a public use. The court said:

> "We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 424, 72 S.Ct. 405, 407, 96 L.Ed. 469. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."

Also, in a similar case in Minnesota— *Housing and Redevelop. Auth. v. Minneapolis Met. Co.,* 259 Minn. 1, 104 N.W.2d 864, 874 (1960), involving the taking of the Metropolitan Building for the urban redevelopment project known as Gateway Center Urban Renewal Plan, the taking was allowed. The court said:

> "If it appears that the record contains some evidence, however informal, that the taking serves a public purpose, there is nothing left for the courts to pass upon."

Applying these broad principles I find that the North Dakota Legislature has authorized the use of the right of eminent domain for all power transmission lines, and those who challenge a taking for that purpose on the ground that it is not for public use must carry the burden of proof. The trial court, in conclusion # 1, held that the burden was on the plaintiff and, in this, there was error as a matter of law.

The trial court's conclusion # 2 imposed a requirement that the benefit would have to be "direct enough" to support the requirement of public use. There is no law supporting the conclusion that indirect benefits do not support public use in this State.

Conclusion # 3 is in contradiction to the facts. It was uncontradicted in the testimony that, within reasonable assurance in the future, power will be supplied over this transmission line to citizens of North Dakota. The conclusion is therefore erroneous.

SAND and VOGEL, Justices (dissenting).

We are compelled to dissent from the conclusions reached by the majority opinion and more specifically from paragraph 5 of the syllabus, and from the special concurring opinion, for the reasons stated herein. The facts appear to be correctly set forth in the majority opinion, as well as the applicable pertinent case law, but, in our view, the case law supports a conclusion opposite to that reached in the majority opinion.

The Constitution of the State of North Dakota authorizes the use of the eminent domain in § 14, which, as is material here, provides as follows:

> "Private property shall not be taken or damaged for *public use* without just compensation having been first made to, or paid into court for the owner." [Emphasis added.]

This is not a grant of power to the Legislature, but is a limitation upon the Legislature, meaning that the Legislature may not authorize the use of eminent domain except for public use. The public use concept again appears in § 134 of the North Dakota Constitution, which provides as follows:

> "The exercise of the right of eminent domain shall never be abridged, or so construed as to prevent the legislative assembly from taking the property and franchises of incorporated companies and subjecting them to public use; the same as the property of individuals; and the exercise of the police power of this state shall never be abridged, or so construed as to permit corporations to conduct their business in such a manner as to infringe the equal rights of individuals or the general well-being of the state."

It is abundantly clear that the authority granted to exercise the power of eminent domain is limited by the Constitution to the taking of property for public use. The reference to public use in §§ 14 and 134 of the North Dakota Constitution obviously, and out of necessity, must refer to public use to the inhabitants of the State of North Dakota, otherwise this provision would be invalid.

In *Adams v. Greenwich Water Co.*, 138 Conn. 205, 83 A.2d 177 (1951), the court said:

"It is true that no state is permitted to exercise or authorize the exercise of the power of eminent domain except for a public use within its own borders. [Citations omitted.]"

It continued by saying that such taking will not be prevented because it will also serve a public use in another jurisdiction.

"If the taking is for a public use which will provide a substantial and direct benefit to the people of the state which authorizes it, it is a proper exercise of the power of eminent domain even though it also benefits the residents of another state."

The North Dakota Supreme Court, in *Sheridan County v. Davis*, 61 N.D. 744, 240 N.W. 867 (1932), in paragraph 1 of the syllabus, said:

"A grant of power to a governmental subdivision to exercise the right of eminent domain should be strictly construed."

In the body of the opinion, the court quoted from Lewis on Eminent Domain (3d ed.) § 388:

". . . all grants of power by the government are to be strictly construed, and this is especially true with respect to the power of eminent domain, which is more harsh and peremptory in its exercise and operation than any other."

If the power of eminent domain is to be strictly construed when it involves a grant to a governmental subdivision, it would necessarily follow that a similar type of grant or power given to a private or public corporation must also be strictly construed.

We must assume that the Legislature was aware of the limitations in § 14 of the North Dakota Constitution, which limits the taking of property by eminent domain to those instances where it will serve a public use, when it enacted Chapter 32–15, North Dakota Century Code, which sets forth how eminent domain may be exercised and the purposes for which it may be exercised.

Section 32–15–02(10), NDCC, provides as follows:

"Subject to the provisions of this chapter, the right of eminent domain may be exercised in behalf of the following public uses:

"10. Oil, gas, and coal pipelines and works and plants for supplying or conducting gas, oil, coal, heat, refrigeration, or power for the *use of any county, city, or village, or the inhabitants thereof,* together with lands, buildings, and all other improvements in or upon which to erect, install, place, maintain, use, or operate pumps, stations, tanks, and other machinery or apparatus, and buildings, works, and plants for the purpose of generating, refining, regulating, compressing, transmitting, or distributing the same, or necessary for the proper development and control of such gas, oil, coal, heat, refrigeration, or power, either at the time of the taking of said property or for the future proper development and control thereof; "

The majority opinion construes subsection (10) as authority for Square Butte to exercise the power of eminent domain. The special concurring opinion goes further and reasons that the enumerated and itemized activities stated in subsection (10) are declared to be public uses by specific legislative action and as such the landowner now must assume the burden to establish that the contrary exists. With this concept we cannot agree. In our view, the Legislature merely provided that only those activities itemized, enumerated, or listed in subsec-

tion (10) may be the basis for exercising eminent domain *provided* a public use would result. The Legislature did not say they were, nor did it make these activities a public use per se, but said "may be exercised in behalf of the following public uses." Thus the taking would be permissible only if the public use were to result. There is, however, a further question whether the underscored language is an additional limitation requiring that the public use be to or for the benefit of the inhabitants of the city or county wherein the property was located and was taken. If the power of eminent domain is to be strictly construed, for which there is reliable authority, a conclusion that the benefit must be to the inhabitants wherein the land was located and taken must be favored. This precise question has not been raised, but it is a question which is deserving of legislative attention and action. If this question is required to be resolved by judicial interpretation, the court must and should take into account the admonition that such power is to be strictly construed and limit the use of eminent domain, rather than expand upon such power.

The term "public use" is subject to judicial interpretation and the courts have held that such term is the equivalent of "public benefit" or "public welfare."

Nichols on Eminent Domain, 2A, § 7.2[2], states as follows:

"Judicial opinion which follows this broad concept considers that the narrow doctrine has been repudiated and is no longer the prevailing view. 'Public use' is considered 'public benefit' and it is not considered essential that the entire community or even any considerable portion thereof should directly enjoy or participate in any improvement in order that it constitute a public use. This is true whether the court is proceeding under the narrow concept or the broad concept. It has been said that the requirements, as to public use, for a law embracing the taking of land are as follows:

"(1) That it effect [*sic*] a community as distinguished from an individual;

"(2) That the law control the use to be made of the property;

"(3) That the title so taken be not invested in a person or corporation as a private property to be used and controlled as private property; and

"(4) That the public reap the benefits of public possession and use and that no one exercise control except the public."

The same authority, in § 7.22, gives the following analysis of the concept of public use:

"A definition of public use which, while not concise, is consistent in all particulars with the weight of judicial authority is, accordingly, as follows:

"It is a public use for which property may be taken by eminent domain,

"(1) To enable the United States or a state or one of its subdivisions or agencies to carry on its governmental functions, and to preserve the safety, health and comfort of the public whether or not the individual members of the public may make use of the property so taken, provided the taking is made by a public body;

"(2) To serve the public with some necessity or convenience of life which is required by the public as such and which cannot be readily furnished without the aid of some governmental power, whether or not the taking is made by a public body, provided the public may enjoy such service as of right;

"(3) In certain special and particular cases, sanctioned by ancient custom or justified by requirements of unusual local conditions, to enable individuals to cultivate their land or carry on business in a manner in which it could not otherwise be done, if their success will indirectly enhance the public welfare, even if the taking is made by a private individual and the public has no right to service from him or enjoyment of the property taken."

Whatever may be embraced in the term "public use" or in the various shades of its meaning, the use, benefit, or welfare must be for the inhabitants of the State as a minimum requirement and not to some oth-

er State or country where the eminent domain power is exercised by a private corporation (see *Adams, supra)*, as distinguished from the exercise of such power by the federal government.

The benefits to the public, in our view, may not be remote, indirect, incidental, or speculative to satisfy the constitutional public use requirement. They must be apparent and direct.

In *Gralapp v. Mississippi Power Company*, 280 Ala. 368, 194 So.2d 527, 531 (1967), the Alabama Supreme Court said:

"Of course, it is a fundamental principle in the law of eminent domain that private property may not be condemned unless it is to be subjected to a recognized public use, affording benefits which are not vague, indefinite or restrictive."

The court also said:

". . . the right to condemn in this case cannot be denied because public uses in another state would be promoted also."

The Alabama court also quoted with approval from an earlier Alabama decision, as follows:

"It is equally clear that this right is not to be denied where public uses are to be subserved in the state granting condemnation, because in connection therewith, public uses in another state may be likewise promoted. While a state will take care to use this power for the benefit of its own people, it will not refuse to exercise it for such purpose, because the inhabitants of a neighboring state may incidentally partake of the fruits of this exercise." [Underscoring ours.]

We are not dissenting because some inhabitants of another state will be receiving benefits from this transmission line, but rather because the benefits to the inhabitants of this state will be incidental, secondary, and will not meet the requirements of

law, nor do they meet the public use concept.

The direct current transmission line from Center, North Dakota, to Duluth, Minnesota, does not meet the pertinent conditions summarized by Nichols or by case law, as stated above, cited in the majority opinion and mentioned later herein.

We agree with the majority opinion through Part II, and particularly the last two paragraphs of Part II:

"From these cases, it appears that the following elements must be present for a public use to exist in the state where the property sought to be condemned lies. First, the public must have either a right to benefit guaranteed by regulatory control through a public service commission *[Bokma]*[1] or an actual benefit *[Gralapp]*[2]. Second, although other states may also be benefited, the public in the state which authorizes the taking must derive a substantial and direct benefit *[Greenwich Water]*[3], something greater than an indirect advantage *[Grover Irrigation]*[4]. Third, the public benefit, while not confined exclusively to the state authorizing the use of the power *[Greenwich Water]*, is nonetheless inextricably attached to the territorial limits of the state because the state's sovereignty is also so constrained *[Clark*[5] and *Grover Irrigation]*.

"To dispose of this case, we must determine whether the benefits alleged by Square Butte provide, either singly or in unison, a substantial and direct benefit to North Dakota." [Footnotes added.]

In applying the foregoing principles of law to the facts in the instant case, we are compelled to reach a conclusion opposite to that of the majority opinion. We cannot recognize that the benefit to the North Dakota public is direct or substantial. In our view, the benefit, if any, is remote,

1. *Montana Power Co. v. Bokma*, 153 Mont. 390, 457 P.2d 769 (1969).

2. *Gralapp v. Mississippi Power Company*, 280 Ala. 368, 194 So.2d 527 (1967).

3. *Adams v. Greenwich Water Co.*, 138 Conn. 205, 83 A.2d 177 (1951).

4. *Grover Irr. & Land Co. v. Lovella Ditch, R. & Irr. Co.*, 21 Wyo. 204, 131 P. 43 (1913).

5. *Clark v. Gulf Power Company*, 198 So.2d 368 (Fla.App.1967).

indirect, incidental, and speculative, which does not constitute a sufficient "public use" for the exercise of eminent domain.

In the *Gralapp* case, *supra,* the Alabama court observed that the evidence established that the electricity would flow in both directions along the lines sought to be constructed. It then said,

"We cannot agree there would be no benefits to the public in Alabama from the construction and use of this power line."

It must be observed that there is, however, a major distinction between the *Gralapp* case and the case under consideration. In the case under consideration, the transmission line is DC and will not be converted to AC until it reaches Duluth, Minnesota. Its use, if any, in North Dakota would be incidental rather than direct. The line could not be usefully "tapped" in North Dakota. We have here the reverse of the *Gralapp* case in this instance with the direct or primary benefit to Minnesota residents and indirect benefits, if any, to North Dakota residents.

In *Montana Power Co. v. Bokma,* 153 Mont. 390, 457 P.2d 769 (1969), the court had under consideration condemnation proceedings instituted by an electric public utility to acquire a right of way easement across defendant's land for the purpose of constructing an electric power transmission line which was to provide electric power and service to a single customer. The transmission line, however, was available to any other customer who would wish to use it. The Montana Supreme Court held that the acquisition was for a public use inasmuch as the utility could be compelled to serve any member of the public from the proposed line. The court quoted approvingly from 2A Nichols on Eminent Domain (3d ed.) § 7.522[3] as follows:

"As long as every member of the public has an equal right with all others, on equal terms, to the use of the power produced, it matters not that every person is not actually benefited thereby."

In the instant case, we have a DC line which would be of no avail until the direct current had been changed to AC, which does not take place in North Dakota but takes place at Duluth, Minnesota, from where the energy would be filtered back westward.

The Wyoming Supreme Court in *Grover Irrigation & Land Co. v. Lovella Ditch, Reservoir & Irrigation Co.,* 21 Wyo. 204, 131 P. 43 (1913), had under consideration a case involving the diversion and appropriation of water in Wyoming for the irrigation of land in Colorado. The court held that the benefits which would be available to Wyoming were indirect and remote and were not sufficient to justify the exercise of the power of eminent domain.

The cases cited in the majority opinion, in our view, support an opposite conclusion than that reached by the majority.

The majority concludes that the agreement evidences a reasonable probability that Minnkota's customers in North Dakota will receive power from the Square Butte project. A reasonable probability is not sufficient, in our view, it must be a certainty. The majority opinion also concludes that there are other incidental benefits in terms of power availability and cost savings to North Dakota. Case law has repeatedly said that incidental benefits are not sufficient, there must be direct benefits in order to justify the taking of property by eminent domain. The majority opinion concludes by stating:

"Because of the cumulative effect of the increase in reserve and emergency supplies, of the stabilizing effect of the DC line on the existing AC system, of the existence of the *options and the likelihood* that Minnkota will exercise its options to receive power from Square Butte after 1985, of the lower cost of that power, and of certain incidental benefits, we disagree with the trial court's conclusion that Square Butte has failed to establish a public use." [Emphasis added.]

These conclusions are not in accord with the principles of law earlier announced in the opinion. The mentioned options are not to be exercised by the inhabitants of North Dakota, and do not qualify as a direct benefit to North Dakota, nor does the "likeli-

hood" that Minnkota will exercise its option satisfy any requirement that the benefits be direct and not incidental.

The majority opinion puts the North Dakota consumer in the position of going to Midcontinent Area Power Pool (MAPP), of which Minnkota and MP&L are members, with hat in hand and asking, "Please, may we have some of our energy." This is the picture after North Dakota coal has been converted into electric energy, in North Dakota, and then transmitted directly to Duluth, Minnesota, by a direct current line. If the transmission lines were AC, the objection would not be as great because the line could be "tapped" and transformers could be installed and energy could be used in North Dakota, but as it is now no energy can be available to North Dakota until it has been converted to AC at Duluth and then only as it is filtered back into transmission systems in Minnesota, which may or may not bring the energy back to North Dakota. The majority opinion permits pirating North Dakota resources and land primarily for the benefit of persons other than the inhabitants of the State of North Dakota. The benefits to the public (inhabitants of North Dakota, in this case) to satisfy the constitutional public purpose should be concomitant with the transmission of the energy on the completed line, and should be apparent rather than obscure or dependent upon a future contingency.

Square Butte was designedly created as a North Dakota corporation for the purpose of building an electrical energy, DC, transmission line from Center, North Dakota, to Duluth, Minnesota. Square Butte would not control the electrical energy which is transmitted over the DC line, particularly after it reaches Duluth, Minnesota, its point of destination, where it will be converted into AC.

We thus have a situation where the condemnor is in no position to assure that the electrical transmission line will have a public use or benefit for or to the North Dakota inhabitants. The benefit, if any, that will result to any North Dakota inhabitants would come from the electrical energy which may filter back into the North Dakota network in the eastern part of the State. The benefits so obtained would be incidental, rather than direct.

This dissent does not imply that Square Butte may not transmit the energy as proposed but merely concludes that Square Butte may not employ or rely upon the power of eminent domain, a quasi-governmental function, to acquire the necessary leases or easements to accomplish this.

We would affirm the judgment of the trial court.

VOGEL, Justice (dissenting).

I fully agree with the dissent of Justice Sand, and add a few remarks of my own.

The benefits to North Dakota claimed in the majority opinion (and admitted to be insufficient individually to constitute public benefits) can be divided into three categories: first, the "probability that Minnkota customers will receive direct and substantial power after 1985," as to which I agree with Justice Sand and the trial court that a mere option exercisable in eight or more years by a board the majority of whom are nonresidents of this State is an insufficient basis for the granting of the quasi-governmental power of eminent domain to a corporate shell; second, the claimed stabilizing effect of the DC line on the AC system in North Dakota; and, third, the "incidental benefits" such as assumed lower costs in the distant future due to cheaper construction at present-day costs, and emergency backup potential.

The "incidental benefits" can be dismissed as irrelevant to the problem before us, which is whether the public benefits justify the use of eminent domain. The "incidental benefits" are equally applicable to all plant and transmission line construction anywhere, since all lines are interconnected with others, so the construction of any line anywhere adds backup potential to all lines to which it is interconnected. Such potential, standing alone, is no reason for allowing the use of eminent domain. If the mere addition of generating capacity anywhere were enough to justify the use of

eminent domain, judicial review would be meaningless.

The one benefit that comes closest to being a public benefit justifying the use of eminent domain is the claimed stabilizing effect of the DC lines on the system in North Dakota. It appears that there will be some benefit from the damping effect of the DC line on oscillations on heavily loaded AC transmission lines over long distances. Such a benefit, while important, will apparently be less important when AC lines are less fully loaded than at present. The trial court concluded that this one benefit was insufficient to justify the use of the power of eminent domain to acquire 200 miles of right-of-way, and I believe the court's finding, treated with the deference it deserves, is not clearly erroneous or an abuse of discretion.

I believe some comment on the special concurrence is called for. Like the majority opinion, most of it is unexceptionable discussion, but it goes astray at the end. I specifically disagree with several statements in it. As Justice Sand points out, it is incorrect to say that the burden is on the landowner to prove that the taking is not for a public use. While it is true that "There is no law supporting the conclusion that indirect benefits do not support public use" in this State, both the majority and dissenting opinions contain citations to cases in other jurisdictions which state the general rule that indirect benefits do not support public use. Such cases include *Gralapp v. Mississippi Power Co.*, 280 Ala. 368, 194 So.2d 527 (1967); *Adams v. Greenwich Water Co.*, 138 Conn. 205, 83 A.2d 177 (1951); and *Grover Irrigation and Line Co. v. Lovella Ditch R. & Irrigation Co.*, 21 Wyo. 204, 131 P. 43 (1913). The only reason we have no decision is that the question has not arisen in this State before.

It is unfair to criticize the conclusion of law of the trial court that "Square Butte will not supply electrical power to the citizens of North Dakota." That statement is literally true. Square Butte will in the immediate future sell electricity to Minnesota Power and Light Company, which faces a huge increase in demand from the taconite industry in Minnesota, soon to come. Square Butte may in the indefinite future (starting in 1985, at the earliest) sell power to Minnkota, which has customers in North Dakota. But Square Butte itself is, if anything more than a shell, a manufacturer and wholesaler of electricity, and not a supplier to individual citizens.

Citations to *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), and *Housing and Redevelop. Auth. v. Minneapolis Met. Co.*, 259 Minn. 1, 104 N.W.2d 864 (1960), lose their relevancy when the facts of those cases are kept in mind. Both cases involved urban renewal programs, in both cases there had been legislative or Congressional determinations of the need for urban renewal of the general area, and public agencies had been given authority to designate the specific areas to be renewed and to develop plans for doing so. Both involved the exercise of the police power to eliminate slum conditions. Under such circumstances it is not surprising that the use of eminent domain was upheld. But the factual differences between those cases and ours show how little help the decisions are to us, faced as we are with entirely different facts, especially a total absence of governmental participation or specific authorization.

I suggest that this case represents a fair test of the outer limits to which private use of eminent domain can be extended, and that the majority allows an almost limitless use. We have here a cooperative, organized by a private utility and a generating cooperative, for reasons of their own. It has but one employee. Since it was incorporated under generous statutes which give it the power of eminent domain, it asserts that it can use that power to acquire land for transmission lines even though not one watt of the power can be used in the State whose power of eminent domain is being used for at least eight years, with subsequent use dependent upon the exercise of options by a board of twelve, eight of whom are nonresidents of that State.

If corporate powers of eminent domain extend to this case, as the majority says

they do, I find it difficult to conceive of a situation to which they would not extend.

Under our laws, as I view them, Square Butte is welcome to acquire right-of-way by purchase, but not by eminent domain. The claimed public benefits are so illusory, so metaphysical, and so chimerical that they cannot, individually or collectively, justify the use of the quasi-governmental power of eminent domain.

I am authorized to state that Justice SAND joins in the foregoing dissent.