UNITED POWER ASSOCIATION and Cooperative Power Association, Plaintiffs and Appellees,

v.

Douglas M. MUND and Mary Alice Mund, Defendants and Appellants,

and

Dickey Rural Telephone Mutual Aid Corporation, Town of Hall, Sargent County, Larry D. Moxness, Mary K. Moxness, Federal Land Bank of St. Paul, United States of America acting through the Farmers Home Administration, U. S. Department of Agriculture, Marvin W. Mund, L. Delores Mund, Defendants.

Civ. No. 9451.

Supreme Court of North Dakota.

July 7, 1978.

As Corrected July 12, 1978.

Kief, Duranske & Fuller, Bemidji, Minn., for defendants and appellants; argued by George L. Duranske, Bemidji, Minn.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, Ryan & Ryan, Aitkin, Minn., and Mackoff, Kellogg, Kirby & Kloster, Dickinson, for plaintiffs and appellees; argued by John D. Kelly, Fargo.

PEDERSON, Justice.

Mary Alice Mund[1] (hereinafter Mund) is the owner of farmlands which were condemned by the United Power Association and Cooperative Power Association (herein-

---

1. Douglas M. Mund, husband of Mary Alice, was a party at the trial below. He died before this appeal was heard. Mary Alice Mund continues the appeal.

after UPA–CPA) for the purpose of constructing a high voltage, direct current transmission line. UPA–CPA instituted eminent domain proceedings in Sargent County against Mund. By her answer in that proceeding, Mund placed at issue the question of UPA–CPA's right to invoke eminent domain for the construction of the transmission line.

The trial court concluded that UPA–CPA "have established the necessity and public use and benefits of the Coal Creek dc transmission line . . . ." On appeal Mund argues that the question of "public use" was wrongly determined. She does not challenge the trial court's determination of necessity of the project. The issue of damages was not before the trial court. We affirm.

The requirement that property be taken only by the process of law was established in 1215 A.D. when the English nobles journeyed to St. Albans to impose the Magna Charta upon King John. Section 39 of that venerable instrument says, in part:

"No free man shall be . . . disseised . . . unless by the lawful judgment of his peers or by the law of the land."

By the law of North Dakota due process requires that the power of eminent domain be exercised only to take property for the "public use." Section 14, North Dakota Constitution; §§ 32–15–01 and 32–15–02, NDCC.

Mund asserts that in finding a public use the trial court failed to apply certain standards enunciated by this Court in *Square Butte Elec. Coop. v. Hilken,* 244 N.W.2d 519 (N.D.1976). This Court said, at 525:

". . . that the following elements must be present for a public use to exist in the state where the property sought to be condemned lies. First, the public must have either a right to benefit guaranteed

by regulatory control through a public service commission . . . [*Montana Power Company v. Bokma,* 153 Mont. 390, 457 P.2d 769 (1969) or an actual benefit . . . [*Gralapp v. Mississippi Power Company,* 280 Ala. 368, 194 So.2d 527 (1967)]. Second, although other states may also be benefited, the public in the state which authorizes the taking must derive a substantial and direct benefit . . . [*Adams v. Greenwich Water Co.,* 138 Conn. 205, 83 A.2d 177 (1951)], something greater than an indirect advantage . . . [*Grover Irr. & Land Co. v. Lovella Ditch, R. & Irr. Co.,* 21 Wyo. 204, 131 P. 43 (1913)]. Third, the public benefit, while not confined exclusively to the state authorizing the use of the power [*Greenwich Water*], is nonetheless inextricably attached to the territorial limits of the state because the state's sovereignty is also so constrained . . . [*Clark v. Gulf Power Company,* 198 So.2d 368 (Fla.App.1967), and *Grover Irrigation*]." [2]

Mund argues that the claimed failure to abide by those standards was error as a matter of law and that the effect was to render the trial court's findings clearly erroneous.

We first must determine if the proper standards were applied. We find that they were. The trial court came to the legal conclusion "that the Coal Creek project provides *direct and substantial public uses and benefits to North Dakota* . . . ." [Emphasis supplied.] This conclusion is based upon the findings of fact which reveal that the trial court did apply the standards enunciated in *Square Butte, supra.* We find no error in the trial court's application of the law.

We next look to the evidence to determine if the findings of fact are clearly erroneous.[3] In so doing we apply Rule

**2.** Although *Square Butte* was a 2–1–2 decision, four members of this Court expressed agreement with and approval of the above quote.

**3.** UPA–CPA argue that, because certain findings are not claimed to be clearly erroneous, this Court must accept them as written. It is

posited that to do otherwise would be to grant trial de novo. We do not agree. Although we strongly disparage such loose practice, where the argument of the appellant *leaves no doubt* which findings are thought to be clearly erroneous, we make the review provided for by Rule 52(a), NDRCivP. It is crucial that the appel-

52(a), NDRCivP. We must uphold those findings if evidence supporting them exists, unless we are left with the definite and firm conviction that a mistake has been made. Although she has not argued that individual and specific findings of fact are clearly erroneous, Mund's contentions are directed at five of the trial court's findings of fact.

### 1.

■ In finding of fact number V the trial court stated:

". . . [the North Dakota State] Water Commission issued . . . [UPA–CPA] a permit which includes a number of relevant conditions. . . . Under the water permit conditions . . . [UPA–CPA] have committed themselves to supply electricity from Coal Creek to North Dakota users for temporary periods upon a declaration of emergency by the Governor of the State of North Dakota."

It is undisputed that UPA–CPA were required, as a condition to obtaining a water permit, to agree to supply temporary power from Coal Creek in certain emergency circumstances. Mund argues, in effect, that the permit condition is meaningless because it creates no new obligation to supply power. It is suggested that the condition is "either one which would politically placate residents of North Dakota or one which would serve the UPA–CPA interest and give UPA–CPA an arguable point of public use in . . . North Dakota rather than any meaningful use."

Whether the agreement imposes *new* obligations upon UPA–CPA is not the crucial issue. What is crucial is that the State of North Dakota, through its water commission, now has the power to impose a *sanction* for a failure to comply with that condition (among others). That sanction is a severe one: forfeiture of the conditional or perfected water permit. We think the power, vested in the North Dakota State Water Commission, to work a forfeiture of UPA–

CPA's water permit provides support for the trial court's conclusion that a public use exists. This is because a public right to benefit, guaranteed by regulatory agency controls, inheres in the permit. Mund has not actually disputed the existence of the permit. Under these circumstances we find that substantial evidence supports the trial court's finding of fact number V and it is not clearly erroneous.

### 2.

■ In finding of fact number VIII the trial court stated:

". . . United will supply Coal Creek electricity to Northern States Power and Ottertail [Power Company] for consumption within North Dakota when Stanton [Power Plant] is not operating. Thousands of North Dakota consumers . . . will be provided with their electrical needs by Coal Creek electricity approximately 15% of the time on an average annual basis."

The undisputed evidence shows that the Stanton plant and the Coal Creek plant will be interconnected. It is also undisputed that the Stanton plant is and has been subject to scheduled shutdowns about 15% of the time and that adequate supplies of electricity for North Dakota consumers have been made available without the Coal Creek interconnection. From this Mund reasons that the real purpose of the interconnection is to provide electricity to Coal Creek during downtime at that plant. We do not doubt that Mund is correct that *a* purpose of the interconnection is to benefit Coal Creek. We also do not doubt that another purpose, upon which the trial court based its finding, is to provide a benefit to North Dakota consumers of electricity. The fact that such a benefit is already available does not preclude a showing that it will henceforth be made available from this new source.

The evidence clearly supports the trial court's finding of fact number VIII, even given the accuracy of Mund's argument.

lant's brief and appendix, although in a format which fails to comply with Rule 32, NDRAppP, does specify the issue explicitly. See footnote

1, *Sorenson v. Olson,* 235 N.W.2d 892, 895 (N.D.1975).

### 3.

■ In its finding of fact number IX, the trial court stated:

". . . North Dakota members [of the Mid-Continent Area Power Pool] will have at least 150 megawatts of additional reserves available to call upon in emergencies."

Mund does not dispute the fact that the Coal Creek plant will provide the additional reserves, as the trial court found. What is disputed is the benefit to North Dakota of the additional reserves.

Mund directs two arguments to this point:

(1) As a power-exporting state, North Dakota already has more than adequate reserves; and

(2) Any additional power plants erected by Mid-Continent Area Power Pool (hereinafter MAPP), wherever located, provide additional power reserves to North Dakota consumers.

Mund's first point is faulty. Even though North Dakota is a power-exporting state, hence containing power plants which far exceed necessary reserve production for North Dakota only, much of that production is committed to out-of-state consumers. Additional reserves may, and the trial court so found, benefit North Dakota consumers. Mund's second argument is correct, but forms no basis for overturning the trial court's finding. The argument, in effect, admits that a benefit obtains to North Dakota consumers in the construction of the Coal Creek plant.

We find that substantial evidence supports the trial court's finding of fact number IX and it is not clearly erroneous.

### 4.

■ In finding of fact number X the trial court stated:

". . . the Coal Creek project will provide the entire electric requirements of one North Dakota consumer, Falkirk Mining Company."

Mund argues that, although Falkirk Mining Company will be supplied its electric needs by Coal Creek, it is really only the mining arm of the Coal Creek project. Again, even though Mund's contention may be supported by some evidence, it provides no basis for overturning the trial court's finding. The evidence reveals that Falkirk Mining Company is an entity separate from UPA–CPA and is not owned, operated or controlled by UPA–CPA; that Falkirk Mining Company will make its mined coal available to customers other than UPA–CPA. While it cannot be denied that the relationship between the Coal Creek Plant and Falkirk Mining Company is symbiotic, the trial court's finding of fact number X has abundant support in the evidence. It is not clearly erroneous.

### 5.

■ In finding of fact number XVIII, the trial court stated:

"The Coal Creek project . . . will enhance the reliability and integrity of the entire electrical generation and transmission system in North Dakota. However, this factor loses some significance in light of the stabilizing effect that the Square Butte dc transmission facilities have on the present system in North Dakota."

Mund does not so much dispute the trial court's finding that stabilization will occur as she disputes the finding that further stabilization will really benefit North Dakota. We hold that the trial court's finding of fact number XVIII that further stabilization will enhance the reliability and integrity of the system and thus benefit North Dakota is supported by substantial evidence and is not clearly erroneous.

### CONCLUSION

Much of Mund's argument is directed by contentions that the Coal Creek Station and the transmission line running from it are located in North Dakota for reasons of economic convenience. Evidence presented to the trial court points to the accuracy of that position. John Riley, a mechanical engineer involved in the compilation of engineering feasibility studies which consider the economics of generating station siting, trans-

mission line configuration, and other factors, was a witness for UPA–CPA. He testified that "in essence, the final selection criteria is based on the economic advantages of one site versus another site." This, however, is not a reason for denying the power of eminent domain to an organization which has satisfied all the criteria required of those who seek to exercise that great power. The trial court found, upon substantial evidence, that UPA–CPA were entitled to exercise the power of eminent domain.

■ We are satisfied that UPA–CPA have met the requirement of showing a public use, as this Court stated those requirements in *Square Butte, supra.* The evidence supports:

(1) Both the right of the public to benefit through control by the North Dakota State Water Commission and the North Dakota Public Service Commission, and an actual benefit through high voltage, alternating current connections between Coal Creek and various North Dakota consumers;

(2) That the benefit to North Dakota is a substantial and direct one; and

(3) The public benefit of the receipt of that power will inure to the benefit of North Dakota resident consumers.

The judgment is affirmed.

ERICKSTAD, C. J., and PAULSON, J., concur.

VOGEL, Justice, concurring specially.

I concur. While adhering to my view, expressed in dissent, that there was no adequate showing of "public use" in *Square Butte Elec. Coop. v. Hilken*, 244 N.W.2d 519 (N.D.1976), I conclude that there is an adequate showing of public use in the case now before us. The majority opinion, if compared with the facts stated in the majority and dissenting opinions in *Square Butte*, will show the differences. In brief, there are benefits to the public of North Dakota from the construction of the project in this case which were nonexistent or highly speculative in *Square Butte*.

I must add that I deplore, again, the continued effort of the author of the majority opinion to engraft new elaborations and distinctions on the plain language of Rule 52(a), N.D.R.Civ.P. I can see no occasion whatever for the use of such restrictive terminology as "leaves no doubt," "disparage such loose practice," and "specify the issue explicitly" in footnote 3 of the majority opinion and the related text. Rule 52(a) is a tool, not a divinity to be worshipped by sacrificing lower court proceedings to appease the Supreme Court. I again disassociate myself from a one-judge crusade to affix new meanings to a simple rule.

SAND, Justice (concurring specially).

I concur with the result of the opinion because the facts of this case are readily distinguishable from *Square Butte Elec. Coop. v. Hilken*, 244 N.W.2d 519 (N.D.1976), and specifically because the benefits to the State of North Dakota and the public use are real rather than remote and speculative as was the situation in *Square Butte*, in which I dissented. Even though I concur I must nevertheless express strong reservation and doubt regarding the weight given in the opinion in determining benefits derived by the State of North Dakota from the reserve electrical energy made available by the project of UPA and CPA, especially where it is an accepted fact that North Dakota is an electrical power exporting State. Once adequate reserve has been established and made available, what value will additional reserves have? The answer is obvious.