No. 60,667

WILLIAMS TELECOMMUNICATIONS COMPANY, *Appellee*, v. LARRY C. GRAGG and PHYLLIS J. GRAGG, Husband and Wife, *Appellants*, and LARRY C. GRAGG and PHYLLIS J. GRAGG, *Appellants*, v. WILLIAMS PIPELINE COMPANY and WILLIAMS TELECOMMUNICATIONS COMPANY, *Appellees*.

(750 P.2d 398)

Opinion filed February 19, 1988.

*Larry E. Gregg*, of Gregg, Barker and Johnson, of Topeka, argued the cause, and *John R. Hamilton*, of Topeka, was with him on the brief for appellants.

*James D. Waugh*, of Cosgrove, Webb & Oman, of Topeka, argued the cause, and *Michael D. Cooke* of Hall, Estill, Hardwick, Gable, Golden & Nelson, of Tulsa, Oklahoma, was with him on the brief for appellees.

*Ruth A. Sears* and *Lawrence A. Dimmitt*, of Topeka, were on the *amicus curiae* brief for Southwestern Bell Telephone Company.

The opinion of the court was delivered by

McFARLAND, J.: Williams Telecommunications Company (WilTel) filed an eminent domain proceeding against appellants Gragg, and others, seeking a right-of-way for the installation of a fiber-optic telephone cable. Appellants Gragg filed an action

challenging the right of WilTel to the power of eminent domain and seeking a determination that Williams Pipeline Company (WPL) had abandoned its pipeline on appellants' property. The actions were consolidated for trial. The district court held adversely to the Graggs and they appeal.

ABANDONMENT BY WPL

The district court held that WPL had not abandoned its pipeline and pipeline right-of-way.

The scope of appellate review is clear. Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *Moore v. R. Z. Sims Chevrolet-Subaru, Inc.*, 241 Kan. 542, Syl. ¶ 3, 738 P.2d 852 (1987); *Friedman v. Alliance Ins. Co.*, 240 Kan. 229, Syl. ¶ 4, 729 P.2d 1160 (1986). Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶ 2, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984). Stated in another way, "substantial evidence" is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. 169, 172, 630 P.2d 1131 (1981).

A six-inch pipeline was installed across the property in question in 1936 for the transportation of oil and gas. WPL purchased the pipeline in 1983 for the transportation of oil and gas. WPL has never transported petroleum products in the pipeline. Employees of WPL have kept the brush trimmed across the right-of-way and have conducted regular aerial patrol thereof. WPL, further, continues to maintain the cathodic protection to preserve the pipe within the easement, and continues to have low voltage power in each of the pump stations along the pipeline to keep space heaters connected within the equipment and the prime movers to avoid damage. In 1986, WPL and its subsidiary WilTel entered into an agreement whereby WilTel would lease the pipeline from WPL for the purpose of running a fiber-optic telecommunications cable through it. The lease provides, *inter*

*alia*, that during the first 15 years of the contract, if WPL desires to use the pipeline for the transportation of products, WilTel must either remove its fiber-optic cable from the pipe or reimburse WPL for the cost of constructing a new segment of its pipeline system to replace that being used by WilTel. After 15 years, if WPL desires to use the pipeline system, WilTel must remove the fiber-optic cable from the pipe.

It is well settled in Kansas that an easement is not abandoned by mere nonuse. See *Edgerton v. McMullan*, 55 Kan. 90, 92, 39 Pac. 1021 (1895). We reviewed the law regarding abandonment in *Botkin v. Kickapoo, Inc.*, 211 Kan. 107, 109-10, 505 P.2d 749 (1973), wherein we said:

"Generally, abandonment is the act of intentionally relinquishing a known right absolutely and without reference to any particular person or for any particular purpose. Abandoned property is that to which the owner has voluntarily relinquished all right, title, claim and possession, with the intention of terminating his ownership, but without vesting it in any other person and with the intention of not reclaiming future possession or resuming its ownership, possession or enjoyment. In order to establish an abandonment of property, actual relinquishment accompanied by intention to abandon must be shown. The primary elements are the intention to abandon and the external act by which that intention is carried into effect. Although an abandonment may arise from a single act or from a series of acts the intent to abandon and the act of abandonment must conjoin and operate together, or in the very nature of things there can be no abandonment. The intention to abandon is considered the first and paramount inquiry, and actual intent to abandon must be shown; it is not enough that the owner's acts give reasonable cause to others to believe that the property has been abandoned. Mere relinquishment of the possession of a thing is not an abandonment in a legal sense, for such an act is not wholly inconsistent with the idea of continuing ownership; the act of abandonment must be an overt act or some failure to act which carries the implication that the owner neither claims nor retains any interest in the subject matter of the abandonment. It is not necessary to prove intention to abandon by express declarations or by other direct evidence; intent to abandon property or rights in property is to be determined from all the surrounding facts and circumstances. It may be inferred from the acts and conduct of the owner and from the nature and situation of the property. Mere nonuse of property, lapse of time without claiming or using property, or the temporary absence of the owner, unaccompanied by any other evidence showing intention, generally are not enough to constitute an abandonment."

Applying the standards set forth in *Botkin* to the facts relative to WPL's action in regard to the pipeline since its 1983 acquisition, all as previously set forth herein, it is clear that there is substantial competent evidence supporting the district court's

determination that WPL has not abandoned the pipeline or its right-of-way.

## WILTEL'S RIGHT TO EMINENT DOMAIN

K.S.A. 17-618 grants the power of eminent domain to telephone corporations desiring to "transmit . . . communications . . . by electrical current." Appellants contend that transmission of communications by a fiber-optic cable is not the transmission of communications by electrical current since light rather than electricity passes through the cable. Fiber-optics is a technology which uses glass wire to transmit simultaneously thousands of conversations from point A to point B without mix-up. Fiber-optic technology may not use electric current to transmit its communications but it does use electric energy to convert electric communications signals into light energy which travels through the fiber-optic cable, and electricity is used to reconvert the light energy into a signal for delivery to the telephone at the other end of the system. WilTel showed that without the electric energy necessary to convert the electric communications signal into a transmissible light beam and reconvert the signal at the other end, a fiber-optic communications system would not function. The evidence showed that the use of electricity through copper wires is on the wane in the industry and that long-distance communication is accomplished now primarily through radio frequency waves, satellite or crystal microwave, or by fiber-optics.

The controlling statute, K.S.A. 17-618, grants the power of eminent domain to "transmit . . . communications by . . . electrical current . . . ." WilTel offers a persuasive argument in the interpretation of this phrase, as follows:

"Appellants urge that the only thing the Legislature could have intended by this language is that electrical current must flow through the cable. However, that is not what the statute says; the Legislature chose language which is not so narrow and restrictive in meaning and which anticipates technological advances. The key word in the phrase 'transmit communication by electrical current' is the word 'by'. Webster's New Collegiate Dictionary defines the word 'by' as 'through the agency or instrumentality of'; Roget's Thesaurus lists 'by means of', 'with the aid of', and 'using' as synonomous with the word 'by'. Thus, the phrase in question includes by definition any of the following meanings:

"1. 'Transmit communication *through the agency of* electrical current.'
"2. 'Transmit communication *through the instrumentality of* electrical current.'

"3. 'Transmit communication *by means of* electrical current.'

"4. 'Transmit communication *with the aid of* electrical current.'

"5. 'Transmit communication *using* electrical current.'

"Applying any of the above definitions or synonyms, it is apparent that the fiber-optic system transmits communications by electrical current, as intended by the statute. One cannot transmit light through a fiber-optic cable without a light source. One cannot turn on the light source without an energy source. The energy source is an electric current. The fiber-optic telephone system simply will not work without electric current; when it does work, it works *by* electric current."

That this interpretation of the statute should be accepted by this court is further supported by K.S.A. 66-104, which defines the term "transmission of telephone messages" to include:

"the transmission by wire or other means of any voice, data, signals or facsimile communications, including all such communications now in existence or as may be developed in the future."

We conclude the district court did not err in holding that the transmission of communications through the fiber-optic technology herein is the transmission of communications by electrical current within the purview of K.S.A. 17-618.

Next, appellants challenge the district court's determination that WilTel is a telephone corporation within the purview of K.S.A. 17-618.

"Telephone corporation" is not defined in K.S.A. 17-618 nor in the other statutes granting the power of eminent domain to telephone and telegraph corporations (K.S.A. 17-1901 *et seq.*). There was no need to define telephone corporation or telephone company when these statutes were enacted. Each particular area was served by one "full service" telephone company which provided services by stringing wires to connect a particular structure to the system. Through federal regulation, an independent telephone company, providing service to its designated area, had access to the one and only long-distance network. Times have radically changed the telephone system. Whether the bottom line results in progress or retrogression remains to be seen and is beyond the scope of this opinion. In any event, federal deregulation policies, the breakup of AT&T, and the advent of multiple new technologies have forever altered traditional ideas of telephone services and corporations.

The appellants recognize these changes in their brief and argue that this court should somehow break providers of telephone communication services into subclassifications and exclude whatever classification WilTel would fit into from a telephone corporation's statutory right of eminent domain. We recognize that the present rather chaotic state of the industry might result in abuses in the exercise of the right of eminent domain. For instance, there is nothing in the statutes to preclude a competitor of WilTel's from burdening the same property herein with a second right-of-way for its cable. However, there is nothing in the statutes now precluding multiple rights-of-way on the same property for more than one highway or pipeline. If the authority of telephone corporations to exercise the power of eminent domain is to be restricted to certain classes or categories of telephone corporations, this is a matter for the legislature to determine. At present, the Federal Communications Commission regulates operations such as WilTel to lesser degrees than it does what it classifies as "dominant" carriers, but considerable regulation still exists.

In their brief, appellants emphasize the fact that WilTel does not have a Kansas certificate of convenience. Since the filing of appellants' brief, a subsidiary of WilTel, Wiltel Network, Inc., has been issued a certificate of convenience as a "reseller of telecommunication services" and, hence, a public utility.

The fiber-optic cable through the pipeline in question (already in place through agreement of the parties) carries communications for customers of WilTel. Space is leased to those who have need of WilTel's services. Cost and other factors virtually preclude direct services to residential users of telephone services but such companies as MCI or Sprint could purchase usage of the WilTel fiber-optic cable. If such occurs, the residential customers of Sprint or MCI could be using the services of WilTel in making long-distance telephone calls. It should be emphasized that the telephone operation herein is not just "in house" transmission of business communications from one branch of a corporation to another. WilTel's business is the transmission of communications—a service available to any who have need thereof and can afford the cost. There is nothing in K.S.A. 17-618 that restricts the power of eminent domain to telephone corpo-

rations contracting directly with residential customers for telephone services.

We conclude the district court did not err in finding that WilTel was a telephone corporation within the purview of K.S.A. 17-618.

Finally, appellants argue that the taking of the right-of-way herein is not for a public purpose. WilTel's operation is defined as that of an interexchange carrier, providing interstate private line service.

The federally engendered breakup of AT&T which has spawned independent companies such as WilTel was deemed to be an act in the public interest. Presumably, the public is to be better served by competition which lets the marketplace determine the quality and cost of telephone service. WilTel is competing in its area of service. There has never been a requirement for eminent domain purposes that the taking directly benefit a sizeable and identifiable segment of the public. Pipelines carrying gas and petroleum products are a good example of this. In *Mustang Fuel Corp. v. Board of County Com'rs*, 527 P.2d 838 (Okla. 1974), and *Ohio Oil Co. v. Fowler*, 232 Miss. 694, 100 So. 2d 128 (1956), pipelines serving only single customers (public utilities) were held to be for public purposes.

Other state courts have likewise found a public use to exist in analogous situations. See *United Power Ass'n v. Mund*, 267 N.W.2d 825, 828-29 (N.D. 1978) (construction of transmission line from project to serve electric requirements of one customer involved public use where state public utilities commission required project to meet state's emergency electricity needs and where customer sold its product to others); *Square Butte Elec. Coop. v. Hilken*, 244 N.W.2d 519 (N.D. 1976) (construction of transmission line to serve out-of-state customers involves a public use where line will meet in-state emergency power needs and increase reliability of state's electric supply system); *Williams v. Hyrum Gibbons & Sons*, 602 P.2d 684, 687 (Utah 1979) (construction of receiver/transmission station for mobile telephone and radio paging devices involved public use where company interconnected with existing telephone systems); *Dyer v. Texas Elec. Service Co.*, 680 S.W.2d 883, 885 (Tex. 1984) (electric line built to serve one customer was for public use because it enhanced oil production by customer).

The fiber-optic cable in the pipeline under appellants' property will be a part of an interstate system which already has the capability of transmitting communications among such cities as Kansas City, Minneapolis, and Chicago. This operational system already serves some 500 customers. The cities of Topeka and Wichita, in Kansas, will be part of WilTel's system, and services will be added for some major cities located to the west of Kansas. The issuance of a certificate of convenience as a public utility by the Kansas Corporation Commission to WilTel's wholly owned subsidiary, Wiltel Network, Inc., for its business as a reseller of telecommunication services, is indicative of the public nature of the services involved.

Taken in the broadest sense, WilTel's business as an interexchange carrier provides an alternate and additional method of transmission of telecommunications which provides service to the public and might be of greater value to the public in the event of some future emergency situation which restricts or eliminates usage of other methods or systems of telecommunications. Reliable high-speed transmission of telecommunications is more than a convenience to our modern society—it is essential to the transaction of public and private business including national defense.

We must conclude that the taking herein is for a public purpose.

Before concluding, as a note of explanation, it should be stated that the additional taking of a right-of-way was necessary as: (1) the intended usage was for purposes other than the original usage of transportation of petroleum products, and (2) a greater burden is being placed on the property for the fiber-optics usage than for the oil pipeline usage.

The judgment is affirmed.