No. 66,700

ANNE CHRISTINE JENSEN, Individually and as Parent, Natural Guardian, and Next Friend of LUKE CHRISTOPHER RUNFT, a Minor Child, *Appellant,* v. BRUCE LYNN RUNFT, *Defendant,* and ROBERT D. SEATON, *Appellee.*

(843 P.2d 191)

Opinion filed December 11, 1992.

*Norman R. Kelly,* of Norton, Wasserman, Jones & Kelly, of Salina, argued the cause and was on the brief for appellant.

*Mickey W. Mosier,* of Clark, Mize & Linville, Chartered, of Salina, argued the cause, and *Paula J. Wright,* of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a paternity action in which the trial court found it was not in the child's best interests to order blood tests. The trial court then relied upon the presumption of paternity in determining the child's biological father. The Court of Appeals reversed the trial court in an unpublished opinion filed March 13, 1992, and we accepted review.

It is easy to be critical of the three adults involved for putting their own desires, including the desire to punish one or more of the others, ahead of what is in the best interests of the minor child, Luke Christopher Runft. Nonetheless, in reading the facts, it is important to focus on the dispositive issue, which is what is in the best interests of Luke. Luke is now six years of age.

The plaintiff in this case is Luke's mother, Anne Christine Jensen (Chris). Chris was married to Bruce Runft. They had two children, ages 1 and 4, when Chris began an affair with Dr. Robert D. Seaton (Bob). Chris is a nurse and worked with Bob. Bob was and is married and has two children by that marriage.

Chris became pregnant with Luke in late September or early October 1985. When she became pregnant, she was having sexual intercourse with Bruce approximately once a month. At the same time, she was having sexual intercourse with Bob two or three times a week. This course of conduct with Bob continued until several months after Luke's birth.

Bruce did not believe Luke was his son. Nonetheless, in an effort to keep his family together, Bruce agreed to raise Luke as his own son and to place his name as the father on the birth certificate. Bruce was not aware the affair was continuing. The affair did not end until several months after Luke's birth, when Bob made it clear to Chris he was remaining with his family.

In January or February of 1987, Bruce and Chris separated. A separation agreement was signed in which Bruce acknowledged Luke as his child and agreed to support him. Bruce did not raise an issue concerning Luke's paternity in the divorce proceeding. Bruce was ordered to pay support and was given visitation rights. He testified it was his hope a reconciliation would occur and reunite the family unit. That did not occur.

Bruce has and continues to pay child support for Luke. He exercised regular visitation with the three children, and it appears from the record, he established a father-son relationship with Luke.

After Chris married Jerry Jensen, Bruce refused to continue a relationship with Luke. Bruce forced Chris to tell Luke that Bruce was not his father and that Luke would no longer be allowed to accompany the other two children when they visited Bruce. Chris was seeing Dr. John A. Sampson, a psychologist, concerning problems relating to the extramarital affair. Dr. Sampson advised and counseled Chris on how to tell Luke. The doctor since has counseled Luke. Luke was told his father lived in Salina.

Chris believed it would be in Luke's best interests to have his paternity determined. She filed this paternity action, pursuant to K.S.A. 38-1110 *et seq.*, naming Bruce and Bob as defendants.

Chris alleged that Bob is the biological father of Luke. Bob requested a hearing pursuant to *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989).

In *Ross*, this court commented that "the Kansas Parentage Act . . . provide[s] that every child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of his parentage." 245 Kan. at 597. We held: "The Uniform Parentage Act clearly was designed to provide for the equal, beneficial treatment of children. In this regard, it requires courts to act in the best interests of the child when imposing legal obligations or conferring legal rights on the mother/child relationship and the father/child relationship." 245 Kan. at 597.

In this case, after making extensive and detailed findings, the trial court held it was not in the "best interests of Luke and *contrary to public policy* to permit Chris and Bruce to attempt to rebut the presumption of paternity." (Emphasis supplied.)

Chris appealed, contending the trial court erred in not allowing a psychologist to give his opinion it was in Luke's best interests that blood tests be taken and the paternity action go forward. Chris also claimed the trial court erroneously found it was not in Luke's best interests that the paternity action proceed and that blood tests be taken.

The Court of Appeals, in an unpublished opinion, focused on the exclusion of Dr. Sampson's opinion that it would be in Luke's best interests to know who his biological father is. The court reversed, stating:

> "Last, the trial court gave great weight to the 'ancient presumption of legitimacy of a child born in wedlock.' The Kansas Supreme Court, in *Ross*, requires that a full hearing be held and that 'the district court *must* consider the best interests of the child, including physical, mental, and emotional needs.' 245 Kan. at 602. (Emphasis added.) We agree with the trial court that, in some cases, public policy would permit the presumption of paternity to prevail. However, this is not such a case. The court's obligation here is to focus on the needs and interests of Luke. All other considerations are subservient to that end."

A majority of this court agrees with the result reached by the Court of Appeals. The trial court did not allow the expert to testify that it would be in Luke's best interests to proceed with

the paternity action and to ascertain the identity of his biological father. Immediately thereafter, however, the trial court did allow the expert to give testimony that clearly indicated the expert was of the opinion it would be in the best interests of any child to have his or her biological father determined. We are of the opinion the excluded testimony was admissible, but the exclusion is harmless error because the evidence basically was admitted in other testimony. See K.S.A. 60-456(d) and *State v. Graham,* 246 Kan. 78, 80-81, 785 P.2d 983 (1990).

In determining the best interests of Luke, it is important to look at it from the child's point of view. Luke lives in a rural area. This case was filed and the testimony was taken in his home county. Initials were not used. The full names of all the principals were used. Thus, nearly every member of the community has knowledge of the case and the facts. All of the information is available to Luke, his friends, and the entire world. The facts of this case are, therefore, common knowledge in Luke's community, leaving Luke to face his peers knowing they are aware of the following: (1) The man Luke bonded with as a father no longer will have anything to do with Luke because he does not believe he is Luke's father; (2) Luke's own mother says Bob is Luke's biological father; (3) Bob concedes he could be Luke's father; and (4) blood tests can show with virtual certainty which of the two men is Luke's biological father.

Although many people would regard Bruce's actions in forcing disclosure and severing his relationship with Luke as calloused, the record gives every indication that Bruce was a good father to the three children, remained in close contact, and exercised meaningful visitation with the three children until he terminated the relationship with Luke. He has maintained that relationship with the other two children, has and still does meet his support obligations, and pays the medical expenses of the three children. There is no reason to believe he would not resume that relationship if he is satisfied Luke is his biological son.

If blood tests prove Bob to be the father, he and his family may take a different view from that taken at trial. The Seaton family appears to be a forgiving family. If Luke is indeed Bob's son and because the family has forgiven Bob for his past transgressions, then the family members should not reject an innocent

child who made none of the decisions that led to his birth. It is in Luke's best interests that he be entitled to that chance.

It would be hard to justify telling Luke that because of the acts of Chris, Bruce, and Bob, he will never know with certainty the identity of his biological father, leaving him to ponder whether his "real" father would have rejected him if the courts had ordered blood tests.

Basically, all of the evidence, including the guardian ad litem's recommendation, indicates that it would be in Luke's best interests to know the identity of his father. The district court erred in holding otherwise.

The district court is reversed and the Court of Appeals is affirmed. The case is remanded to the district court for further proceedings, including the ordering of blood tests.

SIX, J., concurring and dissenting: The majority asserts that the dispositive issue is "what is in the best interests of Luke." I disagree with the issue characterization. The majority invokes a trial court standard. In fact, the best interests of Luke was the standard applied by the trial court in the case at bar. The issue on appeal is whether the trial court abused its discretion when it found that a paternity test would not be in the best interests of Luke. The evidence before the trial court amply justifies the trial court's decision. I find no abuse of discretion. I would affirm the trial court.

The well-settled appellate rule for evaluating a trial court's findings of fact and conclusions of law "is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. [Citations omitted.]" *J. W. Thompson Co. v. Welles Products Corp.,* 243 Kan. 503, 507, 758 P.2d 738 (1988). " '[S]ubstantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *Williams Telecommunications Co. v. Gragg,* 242 Kan. 675, 676, 750 P.2d 398 (1988).

Trial court discretion is not abused as long as substantial competent evidence supports the judge's conclusions. *Hoffman v. Haug,* 242 Kan. 867, 873, 752 P.2d 124 (1988). ("The test on appellate review of whether the trial court abused its discretion

is whether no reasonable person would agree with the trial court. If *any reasonable person* would agree, appellate courts will not disturb the trial court's decision." [Emphasis added.])

Importantly, we should not: (1) weigh conflicting evidence, (2) pass on the credibility of witnesses, or (3) redetermine questions of fact. Where a trial judge, sitting as a trier of fact, makes a specific finding of fact on apparently conflicting or actually conflicting evidence, we are concerned only with evidence that supports the trial court's findings and not with evidence that might have supported contrary findings. *Bell v. Tilton,* 234 Kan. 461, 468, 674 P.2d 468 (1983).

The local trial judge was in the unique position of evaluating testimony as a total communication event, involving verbal as well as nonverbal communication. Each witness added to the extraordinarily sensitive familial mosaic that developed before the eyes of the trial judge. His responsibility was to evaluate the evidentiary mosaic and determine whether a paternity test was in the best interests of Luke. Deference should be extended to the trial judge's evaluation of the testimony.

In the case at bar, the trial judge explained his conclusions reflecting careful consideration of the various interests we identified in *In re Marriage of Ross,* 245 Kan. 591, 783 P.2d 331 (1989). The *Ross* interests are acknowledged by the majority, *i.e.,* support, inheritance rights, family bonds, and accurate identification of parentage. The trial judge explained at the conclusion of his findings of fact:

"Luke carries the family name Runft. He is part of a family unit that includes a father figure. He is owed a legal duty of support by Bruce and Chris. There is no medical reason why biological paternity needs to be determined. Bruce has 'abandoned' or 'rejected' an innocent child thus terminating the normal father-son relationship. If Bob were determined to be the biological father there is no reason to believe a beneficial relationship would be developed between Luke and Bob. It is difficult to see how pursuing this matter further would benefit Luke."

Based upon his evaluation of the facts, the trial judge methodically set forth a list of relevant legal conclusions, including the following:

"4. Luke's need for a father figure is being met by his stepfather, Jerry Jensen.

"5. Permitting further inquiry into the biological paternity of Luke in an attempt to rebut the presumption of paternity would not be in Luke's best interests.

"6. Under the facts of this case, balancing all of the competing interests, the ancient presumption of legitimacy of a child born in wedlock should prevail and no further inquiry should be permitted concerning biological parentage."

The trial judge was circumspect in applying the *Ross* analysis. The question before us is whether there was substantial competent evidence to support the trial judge's conclusions.

I do not agree with the majority's claim that "[b]asically, all of the evidence" supports the conclusion "that it would be in Luke's best interests to know the identity of his father." Several facts presented at trial could persuade a reasonable person to reach the trial court's conclusion. The trial judge found:

(1) The child's financial needs are adequately met by the mother and the presumed father's support obligation;

(2) the child and his new stepfather have a good relationship and this provides the child with a father figure;

(3) the child has adjusted to the rejection by the presumed father;

(4) the child is part of an ongoing family which has included him in activities even after the presumed father's rejection;

(5) the child does not know the putative father;

(6) the putative father has no interest in the child and the likely rejection by the putative father would create additional emotional problems for the child and make him suspicious of father figures;

(7) neither the child nor the putative father have medical conditions which would warrant determination of the child's biological paternity; and

(8) so long as the child believes his mother has done all she can to resolve the paternity issue he will have no resentment toward her.

The majority does not: (1) point to a lack of substantial evidence supporting the trial court's factual conclusions or (2) advance a rationale to support the belief that a reasonable person could not view the facts in evidence as supporting the trial court's conclusion.

"A court must reach [the conclusion that the paternity action is in the child's best interests] independently based on the facts in the record." *In re Marriage of Ross,* 245 Kan. at 602. A reasonable person arguably could conclude that the variety of the evidence, identified in numbered paragraphs 1 through 8 above, marshals support for the trial court's conclusions.

The majority reasons that the expert opinion of Dr. Sampson was improperly excluded; however, the error was harmless because of the proof provided by Sampson's other statements. I concur in the harmless error analysis. If the harmless error analysis is accepted, does it not follow that the trial judge heard sufficient evidence from Dr. Sampson upon which to base the "best interests" decision? The rationale of the majority highlights the extent to which appellate court judgment has been substituted for that of the trial court.

A factfinder need not accept, without question, an expert's testimony. The opinion testimony of an expert is to be considered as any other testimony and should receive such weight and credit as the factfinder decides to give it. It is not error for the factfinder to disregard expert opinion testimony. *In re Adoption of Irons,* 235 Kan. 540, 546, 684 P.2d 332 (1984).

The trial court, in the case at bar, was entitled to exercise discretion in evaluating Dr. Sampson's testimony. We should not override the trial court's discretion as factfinder unless abuse has been shown. The majority does not explain how the trial court abused its discretion.

The majority opinion states that "nearly every member of the community has knowledge of the case and the facts" and that the information is available to Luke and his peers so it would be best for him to discover his father's identity. I find no reference in the record to either the knowledge of "nearly every member of the community" or the availability of information to Luke and "his peers." The majority's conclusion that it would be best for Luke to discover his father's identity is the type of conclusion that belongs to the trial court under *Ross.* The trial court did not make such a conclusion. Perhaps, if the members of this court had been sitting as trial judges, all seven might have reached a conclusion contrary to the one reached by the trial court. The majority has substituted its judgment for that of the trial court

by remanding the case for blood test authorization. The remand usurps the trial court's authority and denies its function as a factfinder.

Finally, the majority claims that:

"If blood tests prove Bob to be the father, he and his family may take a different view from that taken at trial. The Seaton family appears to be a forgiving family. If Luke is indeed Bob's son and because the family has forgiven Bob for his past transgressions, then the family members should not reject an innocent child who made none of the decisions that led to his birth. It is in Luke's best interests that he be entitled to that chance."

The majority also emphasizes that it does not want to leave Luke "to ponder whether his 'real' father would have rejected him if the courts had ordered blood tests." I find no reference in the record supporting the majority's attribution of a "forgiveness quality" to "the family." The record supports the observations that: (1) Bob and his wife underwent counseling after he informed her about his affair with Chris, and (2) the Seatons resolved to continue their marriage. Bob's testimony demonstrates his emphatic negation of *any* relationship with Luke. The trial judge observed Bob and heard his testimony on direct examination:

"Q. And is it your desire or wish to establish a nurturing father/son relationship with Luke Runft?

"A. No, sir.

"Q. Before receiving the letter from Christine Jensen dated October 1, 1991, it's—I believe it's Plaintiff's Exhibit 3—had a request of that type ever been made of you?

"A. For a nurturing relationship, no.

"Q. For any other type of relationship?

"A. No.

"Q. Are you in a position to establish a nurturing relationship with Luke Runft?

"A. It would be—it would absolutely destroy my marriage, and thereby, my relationship with my girls. I cannot do that."

And on cross-examination Bob stated:

"Q. Assuming Luke is your natural son, that this was proven by blood tests, would you desire to have a relationship with Luke?

"A. No, sir.

"Q. Now, I believe you testified you're involved directly in the lives of your two daughters, you help feed them breakfast when you're home, at night, you read to them, work on their school studies, is that right?

"A. Yes, sir.

"Q. There's nothing that would prohibit you from engaging in that type of activity with Luke, is there?

"A. The main thing it would prohibit, it would be that it would destroy my opportunity to interact with my wife and my daughters.

"Q. Why do you say it would destroy? I don't understand that.

"A. My wife is not my second wife, she's my first wife. I did not marry her with the understanding that yes, we have—we have other past problems that have to be incorporated into our marriage. It's very stressful for our marriage, and I don't know that it could take it.

. . . .

"Q. My question to you is, do you have any curiosity or interest in-in Luke—(interrupted)

"A. No, sir.

"Q. (Continuing)—at this point in time?

"A. No, sir.

"Q. If it were determined that you were Luke's father, what obligation, if any, would you feel toward him?

"A. Emotional obligation, sir?

"Q. Emotional, financial, any obligation at all. What would you feel toward—how you would feel obligated toward Luke?

"A. I'm afraid that I can't do that. I cannot provide any emotional support: Companionship, affection, intimacy, those things are not possible."

I would affirm the trial court.

HOLMES, C.J., and MCFARLAND, J., join the foregoing concurring and dissenting opinion.